John E. FOSTER, Petitioner,

v.

LAREDO NEWSPAPERS, INC.,
Respondent.

No. B-5747.

Supreme Court of Texas.

July 14, 1976.

Jacob G. Hornberger, Laredo, for petitioner.

Mann, Castillon, Freed & Kazen, George P. Kazen, Laredo, for respondent.

SAM D. JOHNSON, Justice.

This libel action instituted by John E. Foster against Laredo Newspapers, Inc. affords this court an opportunity to interpret recent rulings of the United States Supreme Court that establish differing standards of care applicable to various classes of defamation plaintiffs. The trial court rendered a take-nothing summary judgment in favor of the defendant Newspaper and the court of civil appeals affirmed. 530 S.W.2d 611. We reverse and remand the case for trial.

The plaintiff Foster is a licensed civil engineer engaged in private engineering practice in Laredo, Texas. Additionally, Foster is the duly elected county surveyor of Webb County. He also has been regularly hired by the County as a private consulting engineer to perform specific projects. One such private consulting project involved the investigation by Foster of a flooding problem in a subdivision known as Del Mar Hills. On June 17, 1973 an article printed in the Laredo Times newspaper in connection with the flooding problem made the following references to Foster:

"The Rice development official said the flooded area in question was platted by Jack Foster, who doubles as a consultant engineer for Webb County.

"Foster has been handling numerous engineering jobs for the Commissioners Court on a consultant basis involving road improvements, some paving, park recreational work and drainage problems in Del Mar Hills."

The article resulted from a recent flooding incident and an appearance before the commissioner's court of Webb County by a resident of Del Mar Hills complaining of the flooding problem in his subdivision. Following the meeting of the commissioner's court an initial article appeared in the Laredo Times covering the court hearing on the flooding problem. One week later the Newspaper published a follow-up article on the flooding problem, and it was this second article which contained the allegedly libelous statements upon which this action is based. The second article was prompted by a contractor engaged in development of the subdivision who complained to the Newspaper that the first article left a misleading impression that the flooding problem existed throughout Del Mar Hills. The article quoted the contractor's statements at length with regard to the nature of the flooding and his opinion that the County should solve the flooding problem. The statement in the article that Foster platted the flooded area was false.

Foster filed this action against Laredo Newspapers, Inc. alleging that the article was libelous because (1) it attributed to him "direct responsibility for the severe flooding of homes located in said Del Mar Hills, thereby indicating that [Foster's] work was of inferior and unsatisfactory quality," and (2) the phrase "who doubles as consultant engineer for Webb County" used in the article indicated that Foster "was performing services for the County of Webb and other parties when a direct conflict of interest between the said County and other said parties existed, and that therefore [Foster] was guilty of unethical and illegal conduct." Foster sought $250,000 as damages for the allegedly libelous statements and an additional $125,000 punitive damages.

The Newspaper filed a motion for summary judgment on the grounds that Foster is either a "public official" or "public figure" as defined by the Supreme Court of the United States in the line of decisions beginning with New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and consequently there could be no liability without a showing of "actual malice." The Newspaper further contended that the undisputed evidence in the record negated a finding of "actual malice."

The trial court sustained the Newspaper's motion for summary judgment and the court of civil appeals affirmed holding that "Foster clearly falls within the most restrictive definition of a 'public official' or a 'public figure,' and we hold that he was both a public official and a public figure as those terms are defined by the courts of this state and of the United States." 530 S.W.2d 611 at 616. The court further held that the summary judgment proof "establishes as a matter of law that such publication was not made with malice as that term is defined in the applicable state and federal court decisions." 530 S.W.2d 611 at 619.

Foster's principal points of error attack the holding of the court of civil appeals (1) that he was either a "public official" or "public figure," and (2) that the summary judgment proof negated the existence of a fact issue with respect to the question of malice. The initial and crucial question is whether the court of civil appeals correctly classified Foster as a "public official" or "public figure."

## I.  PUBLIC OFFICIAL

In New York Times Co. v. Sullivan, supra, the Supreme Court of the United States, for the first time, considered the extent to which the constitutional protections for speech and press limit recovery in a libel action brought by a public official against critics of his official conduct. The plaintiff, an elected city commissioner whose duties included supervision of the

city's police department, brought suit in a state court alleging that he had been libeled by an advertisement printed in the New York Times newspaper. The advertisement included statements, some of which were false, about action by the city police directed against students who participated in a civil rights demonstration and against a leader of the civil rights movement. Following a jury verdict for the plaintiff and affirmance by the state supreme court, the case was reviewed by the Supreme Court of the United States which reversed and remanded holding that the constitutional guarantees of the First and Fourteenth Amendments require "*a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.*"[1] [Emphasis added.] 376 U.S. 254 at 279–80, 84 S.Ct. 710 at 726. In so holding the Court recognized "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. 254 at 270, 84 S.Ct. 710 at 721. The Court further reasoned that "[a] rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to . . . 'self-censorship.' " 376 U.S. 254 at 279, 84 S.Ct. 710 at 725.

In *New York Times* the Court did not attempt to define the "public official" and "official conduct" concepts, but left determination of the scope of these concepts for future cases.[2] Further explanation of the

"public official" concept was then provided by the United States Supreme Court in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). The plaintiff in *Rosenblatt* was not an *elected* official but, rather, a former supervisor of a county recreation area who was employed by and directly responsible to the county commissioners. His libel action was brought against a local newspaper for publication of a column that allegedly criticized the financial management of the recreation area while it was under the plaintiff's supervision. In deciding whether to classify the plaintiff as a public official, the Court set forth the competing values that must be weighed and formulated a broad definition of the "public official" concept. First, the Court emphasized that there is a strong interest in debate on public issues and about persons who are in a position to influence the resolution of those issues.

> "Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." 383 U.S. 75 at 85, 86 S.Ct. 669 at 676.

Secondly, the Court recognized that "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." In balancing society's interest in protecting the reputations of its citizens and the constitutional values of free speech and press, the Court unmistakably concluded that the "public official" designation does not apply to *all* government employees.[3] Rather, the designation applies "*[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public*

---

1. Hereinafter referred to as the *New York Times* rule.

2. The Court stated: "We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included.

. . . Nor need we here determine the boundaries of the 'official conduct' concept." 376 U.S. 254 at 283 n. 23, 84 S.Ct. 710 at 727.

3. In *Rosenblatt* the Court left open the possibility that on remand the plaintiff could adduce proofs that he was not a "public official."

*interest in the qualifications and perform-ance of all government employees."* [Emphasis added.] 383 U.S. 75 at 86, 86 S.Ct. 669 at 676.

In determining whether Foster was a "public official" for purposes of the *New York Times* rule, two aspects of Foster's relationship with the county government must be examined. Foster was, first, a private consulting engineer who was from time to time employed by the County and, second, he was the duly elected county surveyor.

The Newspaper contends that the *New York Times* rule is applicable because Foster was a "public official" in his capacity as a private consulting engineer employed by the County. The summary judgment proof shows that Foster was employed by the County as a private consulting engineer for numerous projects and, according to the county judge, Foster performed the large majority of the County's engineering jobs. Nevertheless, Foster had no permanent engineering position with the County and it was undisputed that the County also hired other consulting engineers. Therefore, Foster must be treated as a temporary employee of the County and the applicability of the *New York Times* rule must be determined with reference to the particular engineering project discussed in the allegedly libelous article.[4]

Foster's involvement with the flooding problems in Del Mar Hills as a consulting engineer for the County dated back to April 1971 when he was employed by the commissioner's court to conduct an inspection of the newly constructed streets and storm drainage system in Del Mar Hills. Subse-quently, in May and June 1972 when residents of the subdivision complained to the commissioner's court about recent flooding of their homes, Foster was employed to study the drainage problem and determine the availability of a federal grant to remedy the flooding problem. Finally, in June 1973 when a resident of Del Mar Hills again complained to the commissioner's court about the recent flooding of his home, the court summoned Foster to appear before the court and advise it about the drainage problem.[5]

We hold that the summary judgment proof failed to establish that Foster's position as a consulting engineer possessed "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt v. Baer, supra,* at 86, 86 S.Ct. at 676. The summary judgment proof showed that whatever public interest the flooding aroused was focused primarily on the commissioner's court which was attempting to determine the County's responsibility for the flooding problem. Although Foster occasionally reported his findings to the commissioner's court at public meetings, the record fails to show that the presentation of his reports stirred up any significant public interest. The apparent lack of public interest in Foster's activities was undoubtedly attributable to the fact that Foster had little if any authority to exercise on behalf of the County. The commissioner's court assigned Foster specific tasks, such as conducting a drainage study and determining

4. Foster's status as a temporary employee of the County is supported by two additional considerations: (1) it appears that Foster's duties and responsibilities as a county employee varied considerably from one project to another; and (2) if there was any public interest in Foster's employment with the County it would naturally tend to focus on Foster's involvement in each particular engineering project.

5. It appears that Foster was not employed by the County on the date that the allegedly libelous newspaper article was printed. In *Rosen-* *blatt v. Baer, supra,* the Court recognized that "there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify the *New York Times* rule." 383 U.S. 75 at 87 n. 14, 86 S.Ct. 669 at 677. We deem it evident that Foster was not so far removed from his former position as a consulting engineer for the County with regard to the flooding problem as to render the *New York Times* rule inapplicable.

the availability of a federal grant to solve the flooding problem, but the nature of these tasks, as described in the summary judgment proof, did not require that Foster exercise a significant amount of discretion. Furthermore, it does not appear that Foster could personally authorize the expenditure of public funds to solve the flooding problem, nor did he supervise any other employees of the County. Another fact that probably explains the lack of public interest in Foster's activities was that Foster had very little public contact. There was apparently no public input with regard to Foster's employment by the commissioner's court to study the flooding problem. In addition, the tasks assigned to Foster did not require that he act in a representative capacity for the County or have any direct dealings with the public.

The Newspaper also urges that Foster was a "public official" under the *New York Times* rule in his capacity as elected county surveyor and that the allegedly libelous statements in the newspaper article were relevant to his fitness for that elected position. On the other hand, Foster points to the summary judgment proof which indicates that the office of county surveyor entails minimal responsibilities and has become virtually obsolete in recent years. According to Foster, he occupied the office as a matter of convenience to the County because the County was required by statute to elect a surveyor.[6] Furthermore, Foster was paid no salary as county surveyor, and he had no staff provided by the County. During the seven and one-half years that he held the position Foster made an occasional patent survey for the County, but he performed no other duties in his official capacity.

Although the summary judgment proof certainly established that Foster was a member of the lower echelons of the County government, we note that the United States Supreme Court has not reserved the "public official" designation for high-level public officers alone. *Time v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (deputy chief of detectives); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (deputy sheriff); *Beckley Newspapers v. Hanks,* 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967) (elected clerk of county criminal and circuit courts); *Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965) (county attorney). More important, the definition of "public official" in *Rosenblatt v. Baer, supra,* is keyed to the *apparent* importance of the official position and the *public interest* in such position. It may be presumed that a certain amount of public interest exists with regard to any governmental position if the general public selects the person who holds the position through the election process. In recognition of the special public interest in elected officials, the Supreme Court has held that the constitutional guarantees of free speech and press have their "fullest and most urgent application" to the election process. *Patriot Co. v. Roy,* 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). Finally, it cannot be doubted that the *New York Times* rule applies to any *candidate* for public office, even a candidate for a position such as county surveyor, at least during the course of the election campaign. It would be somewhat incongruous to hold that a candidate for public office is a public person during the campaign but loses that status upon taking office. We therefore conclude that Foster was a "public official" for purposes of the *New York Times* rule.

We hold, however, that the summary judgment evidence failed to establish the applicability of the *New York Times* rule because the allegedly libelous statements in the newspaper article did not clearly relate to Foster's "official conduct" as county surveyor. It is undoubtedly true that the United States Supreme Court has interpreted the "official conduct" concept very broadly,[7] but all of the public official defa-

---

**6.** Tex.Rev.Civ.Stat.Ann. art. 5283.

**7.** In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the Court stated:

"The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which

mation cases considered by the Court, except one,[8] involved statements that referred to performance of official duties or fitness for office of government officials. In the instant case, however, the newspaper article containing the allegedly libelous statements made no express reference to Foster's fitness for the office of county surveyor, nor was it concerned with Foster's performance of his official duties. Instead, the article discussed Foster's activities as "consultant engineer for Webb County."

■ Nevertheless, the Newspaper seeks to invoke the *New York Times* rule on the grounds that the allegedly libelous statements in the article were germane to Foster's fitness for the office of county surveyor. However, if the article contained no reference, implied or otherwise, to Foster's position as county surveyor, it could not be said that the article related to his fitness for the office. If such is the instance, the allegedly libelous statements did not concern Foster's "official conduct" and the *New York Times* rule would not be applicable. The "public official" rule set forth in the *New York Times* case was not meant to protect reporting of matters that have at best a coincidental bearing on governmental affairs. Of course, there may be instances where the absence of an express reference to an individual's official capacity is unimportant. Many public officials are so well-known in their communities that the general public automatically associates them with their official positions. In such instances an express reference in a newspaper article to the individual's official capacity is unnecessary and the reference is implied. Based upon the summary judgment evidence presented we cannot conclude that the article in question contained any implied reference to Foster's position as county surveyor.[9] In particular, Foster has shown that the duties and responsibilities of the county surveyor were minimal and that

might touch on an official's fitness for office is relevant." 379 U.S. 64 at 77, 85 S.Ct. 209 at 217. Also, in *Patriot Co. v. Roy, supra,* the Court suggested that the "official conduct" concept has been substantially diluted: "Indeed, whatever vitality the 'official conduct' concept may retain with regard to occupants of public office, cf. *Garrison,* supra, 379 U.S., at 72 n. 8, 85 S.Ct., at 215 [13 L.Ed.2d at 131], it is clearly of little applicability in the context of an election campaign." 401 U.S. 265 at 274, 91 S.Ct. 621 at 626.

**8.** In *Ocala Star-Banner Co. v. Damron,* 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971), the plaintiff, who was a mayor and candidate for county tax assessor, filed a libel action against a local newspaper as a result of an article which mistakenly stated that he had been indicted on perjury charges in a federal court. The article referred to the plaintiff as "local garage owner Leonard Damron" but did not mention that Damron was a mayor or a candidate for county tax assessor. The Court held that the *New York Times* rule was applicable but noted: "Both the trial judge on motion for new trial and the District Court of Appeal rested their conclusion that *New York Times* did not apply partly on the ground that the defamatory article nowhere mentioned the respondent's status as mayor of Crystal River or as a candidate for county tax assessor. The respondent has not pursued that theory here." 401 U.S. 295 at 300 n. 4, 91 S.Ct. 628 at 633.

**9.** The deposition testimony of the Newspaper's city editor who wrote the article in question

indicates that he did not associate the statements in the article with Foster's qualifications for the office of county surveyor. According to the city editor, the sole purpose of the reference to Foster was to show that the County was aware of the flooding problem through Foster's activities as a consulting engineer. The city editor made the following response to a question by plaintiff's counsel:

"Q. In making the statement in the only daily newspaper published in this area that Mr. Jack Foster, whom you know to be a professional engineer, had so platted an area that it was subject to severe flooding, didn't you realize, Mr. Arambula, that this would hurt his reputation and that it would mark his work as being inferior and unsatisfactory?

"A. I would answer that negative, sir. The conversation here had nothing to do with Jack Foster. He [Mr. Rice, the contractor who was being interviewed] injected Jack into the conversation when this matter of the County being responsible and who should look out there and see what's wrong and who should take action to provide a remedy for these people because as I recall in the conversation I asked Mr. Rice—I suggested to him that he should pose this problem to the Commissioner's Court and again here he said, 'well, you know, they know about these problems, they're aware. . . .' "

he was not opposed in any election for the position.

■ Thus, a fact issue was raised as to whether the allegedly libelous statements in the newspaper article referred to Foster's position as county surveyor. In order to establish the applicability of the *New York Times* rule the Newspaper must at least prove upon the trial of this case that the article impliedly referred thereto.[10]

## II.  PUBLIC FIGURE

The *New York Times* rule, which previously had been restricted in application to "public officials," was extended to cover "public figures" in *Curtis Publishing Company v. Butts*, and its companion case, *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). *Butts* involved publication of an article charging a well-known athletic director of a major university with having "fixed" a football game. Although the plaintiff was the university's athletic director at the time the article was published, he was employed by a private corporation and not by the state itself. In *Walker* the allegedly libelous article charged the plaintiff with encouraging and leading rioters on a university campus in connection with a racial controversy. The Court stated that the plaintiff, who was a retired army general, "could fairly be deemed a man of some political prominence." Although the Court could not agree upon an opinion in *Butts* and its companion, *Walker*, a majority of the Court held that the plaintiffs in both cases were "public figures," and further held, through Mr. Chief Justice Warren's concurring opinion, that the *New York Times* rule applies to "public figures" as well as "public officials." Mr. Chief Justice Warren wrote:

".  .  .  it is plain that although they are not subject to the restraints of the political process, 'public figures,' like 'public officials,' often play an influential role in ordering society. And surely as a class these 'public figures' have as ready access as 'public officials' to mass media communication, both to influence policy and to counter criticism of their views and activities." 388 U.S. 130 at 164, 87 S.Ct. 1975 at 1996.

Further elaboration of the public figure concept was provided by the Court in *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The plaintiff in *Gertz* was an attorney representing a murder victim's family in a civil suit against a police officer who was convicted for the murder. The basis for the libel suit was a magazine article in connection with the murder incident which falsely (1) implied that the plaintiff had a criminal record, (2) charged that the plaintiff was a "Leninist" or a "Communist-fronter," and (3) identified the plaintiff as a former official of a Marxist organization. In determining whether *Gertz* possessed the necessary characteristics of a "public figure," the Court observed that "public figures" fall into two general categories:

"In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. *In either case such persons assume special prominence in the resolution of public questions.*" [Emphasis added.] 418 U.S. 323 at 351, 94 S.Ct. 2997 at 3013.

The Court first concluded that the plaintiff did not fit within the category of individuals who are "public figures" for all purposes and in all contexts. The Court then turned to the question whether the plaintiff was a public figure with respect to the particular controversy giving rise to the defamation, and concluded:

"In this context it is plain that petitioner was not a public figure.  .  .  .  *He*

---

**10.** Although it is the task of the trial judge in the first instance to determine the existence of the privilege under the *New York Times* rule, *Rosenblatt v. Baer, supra,* 383 U.S. at 88, 86 S.Ct. 669, the trial court may submit to the jury fact issues relating to the existence of the privilege.

*plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome."* [Emphasis added.] 418 U.S. 323 at 352, 94 S.Ct. 2997 at 3013.

■ There is nothing in the summary judgment evidence to indicate that Foster achieved pervasive fame or notoriety in the community. It appears that Foster certainly did not possess any greater fame or notoriety in his community than the plaintiff in *Gertz* who "served as an officer of local civic groups and of various professional organizations, and . . . published several books and articles on legal subjects." 418 U.S. 323 at 351, 94 S.Ct. 2997 at 3013. We therefore hold, as did the Court in *Gertz*, that Foster did not achieve the status of "a public figure for all purposes and in all contexts."

With regard to Foster's status as a "public figure" within the context of the controversy over the flooding problem, our previous discussion of his role as a consulting engineer made clear that Foster did not assume a special prominence in the resolution of this controversy. Foster is clearly distinguishable from the plaintiff in *Walker* who, according to the Court, made a number of strong public statements related to federal intervention in racial matters and obtained wide publicity of his views. In addition, there is little resemblance between Foster and the plaintiff in *Butts* who was described by the Court as "a well-known and respected figure in coaching ranks" who may have attained "public figure" status by virtue of his position alone.

The summary judgment record does not indicate that Foster had any personal interest in the resolution of the flooding prob-

lem, and he remained strictly within his role as an adviser to the commissioner's court.[11] Consistent with his role as a private consulting engineer employed by the commissioner's court, Foster did not attempt to influence the outcome of the flooding controversy through exposure of his personal opinions in the media. Similar considerations influenced the United States Supreme Court to hold that the plaintiff in *Gertz* was not a "public figure" within the context of that particular controversy:

"He [the plaintiff] played a minimal role at the coroner's inquest, and his participation related solely to his representation of a private client. He took no part in the criminal prosecution of Officer Nuccio. Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so." 418 U.S. 323 at 352, 94 S.Ct. 2997 at 3013.

■ In view of Foster's limited participation in the controversy giving rise to the allegedly libelous newspaper article, we consider it evident that he "did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." 418 U.S. 323 at 352, 94 S.Ct. 2997 at 3013. We therefore hold that the summary judgment evidence failed to establish that Foster achieved the status of a public figure within the context of the local controversy over the flooding in Del Mar Hills.

## III. STANDARD OF CARE

Having held that the summary judgment proof failed to establish that Foster was a "public figure" or that the allegedly libelous statements related to his official conduct, we must now determine whether Fos-

---

11. A quite different situation was presented in *Greenbelt Pub. Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), where it was conceded that the plaintiff was a public figure in the community. The Court stated that "[t]his concession was clearly correct," emphasizing the following factors: "Bresler was deeply involved in the future development of the city of Greenbelt. He had entered into agreements with the city for zoning variances in the past, and was again seeking such favors to permit the construction of housing units of a type not contemplated in the original city plan. At the same time the city was trying to obtain a tract of land owned by Bresler for the purpose of building a school. Negotiations of significant public concern were in progress, both with school officials and the city council. Bresler's status thus clearly fell within even the most restrictive definition of a 'public figure.'" 398 U.S. 6 at 9–10, 90 S.Ct. 1537 at 1539.

ter's right of recovery against the Newspaper as a private individual [12] nevertheless depends upon the *New York Times* standard—knowledge of falsity or reckless disregard for the truth. The question whether the *New York Times* standard applies to private individuals such as Foster was first considered by the Supreme Court in *Rosenbloom v. Metromedia*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Although the majority of the Court could not agree upon an opinion in *Rosenbloom*, Mr. Justice Brennan's plurality opinion did conclude that the *New York Times* standard applies in a libel action by a private individual against a licensed radio station for a defamatory falsehood relating to a matter of public or general concern.

Subsequently, in *Gertz v. Welch, supra,* a majority of the Court rejected the approach of the plurality opinion in *Rosenbloom* and held that states may define for themselves the appropriate standard of liability for a publisher or broadcaster of a defamatory falsehood injurious to a private individual "so long as they do not impose liability without fault." 418 U.S. 323 at 347, 94 S.Ct. 2997 at 3010. The Court reasoned that "[t]his approach provides a more equitable boundary between the competing concerns involved," and "recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation." 418 U.S. 323 at 347–48, 94 S.Ct. 2997 at 3010. The effect of the Court's holding that states may not impose liability without fault on publishers and broadcasters of defamatory falsehoods is to sanction a simple negligence standard as complying with the minimum requirements of the First and Fourteenth Amendments.[13]

As a further limitation upon the right of private individuals to recover in libel actions against publishers or broadcasters of defamatory falsehoods, the Court held in *Gertz* that a private individual "who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury." 418 U.S. 323 at 350, 94 S.Ct. 2997 at 3012. In so holding, the Court explained that the states' interest in protecting the reputation of their citizens becomes more attenuated in the field of presumed and punitive damages, and the discretion of juries to award substantial sums as punitive damages poses a serious threat to the constitutional values of free speech and press.

The limitations imposed in *Gertz* upon the states' right to secure compensation for injuries to reputation represent a minimum standard which the states are constitutionally bound to adopt. However, states retain the right to provide additional safeguards for the constitutional guarantees of free speech and press. Since *Gertz* was decided, two states have extended the *New York Times* standard to cover private individuals involved in matters of public concern. *Walker v. Colorado Springs Sun, Inc.,* Colo., 538 P.2d 450 (1975), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1976) (adopting a slightly modified version of the *New York Times* standard); *Aafco Heating & Air Con. Co. v. Northwest Pub., Inc.,* 321 N.E.2d 580 (Ind.App.1974), *cert. denied,* 423 U.S. 1025, 96 U.S. 1112, 47 L.Ed.2d 318 (1976). With respect to defamatory falsehoods about private individuals and relating to matters of legitimate public

---

**12.** We use the term "private individual" as encompassing "public officials" whose official conduct is not the subject of the allegedly libelous statement.

**13.** Mr. Justice Blackmun's concurring opinion in *Gertz v. Welch, supra,* stated that "the Court now conditions a libel action by a private person upon a showing of negligence, as contrasted with a showing of willful or reckless disregard." 418 U.S. 323 at 353, 94 S.Ct. 2997 at 3014. Also, Mr. Justice Powell's concurring opinion in *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 970, 47 L.Ed.2d 154 (1976), clearly implied that proof of simple negligence satisfies the minimal constitutional requirements: "Thus, while a State may elect to hold a publisher to a lesser duty of care, there is no First Amendment constraint against allowing recovery upon proof of negligence."

concern New York has adopted a "grossly irresponsible conduct" standard of liability. *Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975). However, the majority of courts in other jurisdictions where the question has been decided have adopted negligence as the standard of liability in defamation actions by all private individuals. *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.,* 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), *cert. denied,* 423 U.S. 883, 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); *Cahill v. Hawaiian Paradise Park Corporation,* 543 P.2d 1356 (Haw.1975); *Troman v. Wood,* 62 Ill.2d 184, 340 N.E.2d 292 (1975); *Gobin v. Globe Publishing Company,* 216 Kan. 223, 531 P.2d 76 (1975); *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976); *Stone v. Essex County Newspapers, Inc.,* Mass., 330 N.E.2d 161 (1975); *Taskett v. King Broadcasting Company,* 86 Wash.2d 439, 546 P.2d 81 (1976).

The shortcomings of the *New York Times* standard are widely recognized. In order to recover in a defamation action under the *New York Times* standard a plaintiff must produce "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson, supra,* 390 U.S. at 731, 88 S.Ct. at 1325. The Supreme Court has noted the deficiencies of this strict standard:

> "It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity." 390 U.S. 727 at 731, 88 S.Ct. 1323 at 1326.

The *New York Times* standard, of course, relates only to "public officials" and "public figures." Private individuals, on the other hand, whether engaged in matters of public concern or not, involve quite different considerations. The First Amendment interest in vigorous reporting of the activities of "public officials" is clearly more compelling than the interest in reporting activities of private individuals because "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer, supra,* 383 U.S. at 85, 86 S.Ct. at 675. Furthermore, application of the *New York Times* standard to "public figures" may be justified on the grounds that the state has a less substantial interest in protecting persons who have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods.[14] In contrast, private individuals are more deserving of protection because, as a class, they are less likely to seek public attention and comment. We therefore decline to extend the *New York Times* standard to actions by private individuals seeking to recover compensation for actual injuries.

We also decline to adopt an intermediate standard of liability such as gross negligence because it would not provide demonstrably greater protection to the media from self-censorship than a standard of ordinary negligence. The distinction between ordinary negligence and gross negligence in the defamation context is not entirely clear, and it is doubtful that the choice of one label rather than the other will significantly affect the evolution of constitutional defamation law. Limitations upon the right of recovery in defamation actions that are deemed necessary to protect publishers and broadcasters from an unreasonable degree of liability will undoubtedly be adopted by the courts regardless which label is used.

We hold that a private individual may recover damages from a publisher or broadcaster of a defamatory falsehood as compensation for actual injury upon a showing that the publisher or broadcaster knew or should have known that the defamatory statement was false. In addition, the liability of a publisher or broadcaster of a

---

14. "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Gertz v. Welch, supra,* 418 U.S. at 345, 94 S.Ct. at 3009.

defamatory falsehood about a private individual may not be predicated upon "a factual misstatement whose content [would] not warn a reasonably prudent editor or broadcaster of its defamatory potential." *Gertz v. Welch, supra,* at 348, 94 S.Ct. at 3011.[15]

■ The negligence standard of liability coupled with the "actual injury" requirement established in *Gertz* provides a useful beginning point for the development of constitutional defamation law and has the capability of achieving a fair balance between the competing interests at stake. In light of our adoption of a negligence standard in defamation actions instituted by private individuals such as Foster, the summary judgment rendered in favor of the Newspaper must be reversed. The Newspaper's motion for summary judgment sought to establish the applicability of the *New York Times* standard to Foster as a "public official" or "public figure" and then to negate the existence of any fact issue with respect to the *New York Times* standard. The Newspaper has not asserted a right to summary judgment upon a negligence standard. We therefore find it unnecessary to determine whether the summary judgment proof negated the existence of any fact issues with regard to negligence or to further elaborate upon the negligence standard adopted today.

The judgments of the trial court and of the court of civil appeals are reversed and the cause is remanded for trial.

POPE, Justice (dissenting).

I respectfully dissent. John Foster was a public official when the article in question was published and actual malice was an essential element of the libel action. I cannot improve upon these reasons which are expressed by the opinion in the court of civil appeals:

It is undisputed from the record that (a) Foster is the public surveyor of Webb County, (b) such office is an elective office provided for under the laws of this state, (c) Foster's name has appeared on the public ballot in Webb County on numerous occasions, and he has been elected to such office by the voters of Webb County on numerous occasions, (d) at the time of the alleged libel and for many years before, Foster was the county surveyor of Webb County.

It is also undisputed that Foster, over a period of years, had been employed by Webb County as the consultant engineer on various public projects, including construction of county swimming pools, development of recreational areas, drainage problems in the Del Mar Hills Subdivision, road improvements, jail house improvements, design of a children's park, and work at a county dam. There is testimony that these projects covered the vast majority of all the major county projects during the last ten years and that Foster was the engineer in charge of such projects. It is clear from the record that Foster was hired by Webb County for these projects and was paid out of public funds for such work.

It is also clear that Foster had taken an active part in the particular activities giving rise to the defamation. The newspaper article in which the alleged libelous statement was made involved the problem of flooding in the Del Mar Hills

---

15. The Court added the following caveat in *Gertz*: "Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential." 418 U.S. 323 at 348, 94 S.Ct. 2997 at 3011. We interpret the caveat to mean that *no* liability may be predicated upon a statement whose content would not warn a reasonably prudent editor or broadcaster of its defamatory potential. *See* RESTATEMENT (Second) OF TORTS, § 580B, comment c at 28–9 (Tent.Draft No. 21, 1975). An editor or broadcaster who has taken reasonable precautions to assure that his statements will not be injurious to reputation is no less deserving of protection from libel actions than one who has made a reasonable inquiry to determine the truth of his statements. With respect to the instant case, the summary judgment proof fails to establish that the allegedly libelous statements were insufficient to warn a reasonably prudent editor or broadcaster of their defamatory potential.

Subdivision, which was a matter of considerable public interest in Laredo and in Webb County, and had resulted in citizen's complaints and public meetings in Laredo. Such flooding problems had been the subject of a previous article in the Laredo Times which covered a public meeting of the Commissioner's Court on June 11, 1973, at which time, a private citizen, Mr. Anderson, a resident of the Del Mar Hills Subdivision had complained about the flooding problem. This same citizen had previously complained to the Commissioner's Court in 1972 about such floods and, as a result of such complaint, Foster was called in by the Commissioner's Court to investigate and make a study of the drainage problem. Such study was made by Foster and he reported to the Commissioner's Court in this regard. Foster was paid for such services by Webb County. When Anderson returned to the Commissioner's Court a second time in June, 1973, Foster was again called by the Commissioner's Court because of his familiarity with the problem and participated in the public meeting.

It would appear that Foster was not only involved in the particular controversy giving rise to the suit here involved but that his participation and involvement was connected with and arose out of his official duties and services for Webb County, either as a public official of Webb County or as a paid consultant engineer for such county.

In our opinion, Foster clearly falls within the most restrictive definition of a "public official" or a "public figure," and we hold that he was both a public official and a public figure as those terms are defined by the courts of this state and of the United States. 530 S.W.2d 611, 615–616.

ON MOTION FOR REHEARING

REAVLEY, Justice.

I would affirm the judgment of the lower courts. The Constitution of Texas provides that the Legislature shall "prescribe the duties and provide for the election" of a County Surveyor "who shall have an office at the county seat . . .." Article 16, Section 44. Plaintiff is a public official as the elected County Surveyor of Webb County and the newspaper article, to the extent that it could be said to be defamatory, bears upon the plaintiff's fitness for that office. I find no basis for our holding that the newspaper article itself must give notice of the office or performance of official duties of the plaintiff. Can it be the law that the *Sullivan* rule applies to the publication of a news article about an officeholder whose identity and office is not familiar to the general public—if, but only if, the article itself reveals that the defamed person is an elected official? I regard this rule as contrary to the decisions of the United States Supreme Court.

GREENHILL, C. J., joins in this dissenting opinion.