# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-0669
════════════

DANIEL GREER AND FIX THE FACTS FOUNDATION D/B/A AGENDAWISE,
PETITIONERS,

v.

SALEM ABRAHAM, RESPONDENT

═══════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════════

**Argued January 14, 2016**

JUSTICE DEVINE delivered the opinion of the Court.

A public official who sues for defamation must prove the elements of the tort and, as a constitutional requirement, that the defendant published the falsehood knowing it to be false or acting with reckless disregard for whether it was true or false. This constitutionally-required element is typically abbreviated as the actual-malice element of the tort. That element is at issue in this appeal, which concerns the dismissal of a public official's defamation claim under the Texas Citizens Participation Act (TCPA). *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001-.011.

The TCPA requires the dismissal of legal actions that impinge on First Amendment rights unless "the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). The trial court dismissed

the public official's underlying action under the TCPA, concluding that the official had not met his burden as to the actual-malice element. The court of appeals reversed and remanded, concluding that actual malice was not an element of the public official's defamation claim because the publication did not mention or relate to his official conduct or his fitness for office. 474 S.W.3d 731, 736 (Tex. App.—Amarillo 2014) (mem. op.). Because we conclude actual malice was an element of the public official's defamation claim, we reverse and remand to the court of appeals for it to consider other issues raised by the official, but not addressed by the court.

I

The public official and plaintiff in this case is Salem Abraham. He was elected to the Canadian Independent School District Board of Trustees in 2001 and remained in that office for more than a decade. In 2012, Abraham was supporting his friend and fellow Canadian ISD board member, Ken King, in King's campaign for state representative. King's opponent in that race, Jim Landtroop, portrayed King as fiscally irresponsible during the campaign. A Landtroop campaign mailer stated King had increased spending and raised taxes while on the Canadian school board.

Abraham, who served as the school board's vice-president during King's service, and as its president before that, believed this was untrue. Moreover, he viewed Landtroop's campaign mailer targeting Canadian ISD's spending and taxes as false criticisms of not only King, but also of himself, the other school board members, and the school district itself. Learning that a future Landtroop campaign event was to take place in Levelland, Texas, Abraham decided to attend. The Landtroop campaign billed the event as a public meeting.

2

Levelland is about 200 miles from Canadian. On the day of the event, Abraham and another school-district trustee traveled to Levelland, where they listened to remarks from the candidate and also from the governor. Following these remarks, the moderator asked if there were any questions for the candidate, and Abraham was recognized for a question. After hearing the nature of Abraham's question, however, the moderator decided to move on, stating that the question was not appropriate for the event.

The meeting was subsequently adjourned, and a Landtroop campaign worker approached Abraham, asking him to leave. After briefly discussing the matter, Abraham proceeded to leave, but not before handing out printed materials stating the facts, as he knew them, about Canadian ISD taxes. These materials challenged statements in Landtroop's campaign mailer that were critical of King—statements that Abraham also viewed as false criticism of his school district and fellow school-board members.

Shortly after the public meeting, AgendaWise, a politically oriented internet blog, reported on Abraham's attendance at Landtroop's campaign event in Levelland. The internet article identified Abraham as the campaign treasurer of Landtroop's opponent and a significant financial contributor to the opposition. The article ended with a statement about Abraham's departure from the event that Abraham found offensive. The blog reported: "Abraham had to be forcefully removed from a Landtroop campaign event this week by Governor Perry's DPS detail."

Abraham contacted AgendaWise and its executive director, Daniel Greer, to complain that they had misrepresented his being "forcefully removed" from the meeting. In response, Greer and AgendaWise published the following correction to the article:

3

> Abraham was asked to leave a Landtroop campaign event this week for heckling. Mr. Abraham cooperated.
>
> * * *
>
> Correction: On Wednesday August 1, Mr. Abraham contacted AgendaWise claiming he was not forcefully removed by DPS agents. After conferring with sources, AgendaWise agrees. To the best of our knowledge, Mr. Abraham was asked to leave by campaign personnel and voluntarily cooperated. The story has been amended to better recount the activities.

Abraham complained again, objecting this time to the use of the word "heckling" to describe his conduct. Greer and AgendaWise again corrected the article, deleting the first two sentences regarding Abraham's exit from the meeting and amending its previous correction to read:

> Correction: On Wednesday August 1, Mr. Abraham contacted AgendaWise claiming he was not forcefully removed by DPS agents, as an earlier version of this story claimed. According to Mr. Abraham, he was asked to leave by campaign personnel, voluntarily cooperated, and DPS wasn't involved. The portion about Mr. Abraham's exit has been omitted.

AgendaWise also sent two letters of apology to Abraham over the error.

A few days later, Abraham sued AgendaWise and Greer for libel. The defendants[1] (hereafter collectively referred to as Greer) answered and moved to dismiss pursuant to the Texas Citizens Participation Act (TCPA). *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001-.011. The TCPA provides an expedited procedure for the early dismissal of groundless legal actions that impinge on First Amendment rights. *Id*. § 27.003. The Act imposes the initial burden on the movant, in this case Greer, to establish by a preponderance of the evidence "that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." *Id*. § 27.005(b). The Act then shifts the burden to the nonmovant, in this

---

[1] Abraham sued Fix the Facts Foundation, a Texas non-profit corporation, that was alleged to use AgendaWise as its assumed name for purposes of the internet blog.

case Abraham, stating that the court may not dismiss "if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id*. § 27.005(c).

Abraham does not dispute that his pleadings implicated the TCPA or that his burden under the Act was to establish a prima facie case for each element of his defamation claim. He also did not dispute, at least in the trial court, that he was a public official. For a public-official plaintiff, an essential element of the defamation claim is that the defendant published the alleged falsehood with "actual malice." *See Bentley v. Bunton*, 94 S.W.3d 561, 590 (Tex. 2002) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). Actual malice in this context does not mean bad motive or ill will but rather knowledge of, or reckless disregard for, the falsity of a statement. *Id*. at 590-91. Recognizing this potential burden, Abraham asked the trial court for limited discovery to gather evidence as to Greer's state of mind at the time of publication.

The request was necessary because the filing of a TCPA motion to dismiss typically suspends all discovery in the underlying legal action until the court rules on the motion. TEX. CIV. PRAC. & REM. CODE § 27.003(c). When good cause exists, however, the Act allows limited discovery relevant to the motion. *Id*. § 27.006(b). In this case, the court granted Abraham's request for limited discovery, but Greer responded by asserting the journalist's privilege and declining to reveal his sources. *See id*. § 22.023(a) (protecting journalist's sources from compelled disclosure).

5

In addition to limiting discovery, the TCPA also expedites the process by requiring the trial court to rule on a motion to dismiss within thirty days of the motion's hearing. *Id.* § 27.005(a).[2] The trial court granted Greer's motion to dismiss near the end of this period. About the same time, Abraham challenged Greer's status as a journalist and filed a motion to compel him to answer discovery. *See id.* § 22.024 (providing for limited disclosure under certain circumstances). Although the court did not rule on the motion to compel, it did file findings of fact and conclusions of law at Abraham's request.

In its findings, the court classified Abraham as a public official and the defendants as print media. It also concluded that the statements published by the defendants about Abraham were false and libelous but that Abraham could not establish malice by clear and specific evidence because of the defendants' assertion of the journalist's privilege. Finally, the court concluded Abraham did not bring the legal action "to deter or prevent Defendants from exercising constitutional rights, nor for an improper purpose, nor to harass, delay, or to increase the cost of litigation." *See id.* § 27.007(a) (authorizing this finding to be made).[3]

Abraham appealed, complaining that actual malice was not an element of his claim because his status in relation to the defamation was more that of a private individual than a public official. The court of appeals agreed. It concluded that actual malice was not an essential element of Abraham's defamation action because the internet article did not identify Abraham as a public

---

[2] If no ruling is made, the motion is deemed denied by operation of law, and the moving party may take an interlocutory appeal. *Id.* § 27.008(a).

[3] This finding is the only one expressly required by the TCPA if requested by the party seeking dismissal. *Id.* The Act does not otherwise expressly address findings of fact and conclusions of law, but neither does it forbid them.

official or clearly relate to his conduct as a public official or his fitness for office. 474 S.W.3d at 735-36. The court further reasoned that no connection to Abraham's status as a public official was implied because the article had been published on the World Wide Web, and no evidence existed that Abraham was generally known throughout the world as a member of the Canadian ISD board of trustees. *Id*. at 736.

Abraham also raised other issues that the court of appeals did not address. He complained that the defendants were not journalists, were not entitled to claim the journalist's privilege, and should therefore have been compelled to answer his discovery requests. Abraham argued further that, even if the defendants were journalists, the journalist's qualified testimonial privilege in civil proceedings together with the TCPA's discovery limitations violated his constitutional right to open courts and due process. *See* TEX. CONST. art. I, §§ 13, 19. But having concluded the trial court erred in including actual malice as an essential element of Abraham's defamation claim, the court of appeals found it unnecessary to reach these constitutional issues. 474 S.W.3d at 733. Greer's appeal here accordingly addresses only the actual-malice issue.

## II

Greer argues that actual malice is an essential element of Abraham's defamation claim because the underlying legal action implicates Abraham's status as a public official and thus elevates his burden of proof under *New York Times Co. v. Sullivan* and its progeny. In *New York Times*, the United States Supreme Court imposed under the guarantees of the First and Fourteenth Amendments "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual

7

malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279-80. Thus, under the *New York Times* rule, the actual-malice requirement is added to the burden of proof when the defamation plaintiff is a public official and the defamatory statement relates to the plaintiff's official conduct. *Id.* "Actual malice" in this context does not mean bad motive or ill will, but rather "means knowledge of, or reckless disregard for, the falsity of a statement." *Bentley*, 94 S.W.3d at 590-91. Thus, the constitutional focus is on the defendant's attitude toward the truth, not his attitude toward the plaintiff. *Thomas v. Tel. Pub'g Co.*, 929 A.2d 993, 1007 (N.H. 2007).

Abraham argued in the court of appeals that for purposes of this case he should not be viewed as a public official because the defamatory publication did not refer to his office or connect his conduct to his status as a Canadian ISD trustee. In short, Abraham contends actual malice was not an essential element of his defamation claim because the internet article was unrelated to his conduct or duties as a Canadian ISD trustee. The court of appeals essentially agreed, finding support in our decision in *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (Tex. 1976). *See* 474 S.W.3d at 735-36 (discussing *Foster*).

That case also concerned a defamation action by a public official, Foster, the duly elected county surveyor of Webb County. Foster was also a licensed private engineer. *Id.* at 810. In addition to his official duties as county surveyor, which were minimal,[4] Foster also worked as a private consulting engineer for the county. *Id.* at 813. After a newspaper article falsely associated

---

[4] According to Foster, he occupied the office of county surveyor as an accommodation because the county was required by statute to elect a surveyor. He was paid no salary and had no staff. *Id.* at 814.

Foster with the platting of a flood-prone subdivision in the county, he sued for libel. *Id*. at 811. The newspaper obtained a summary judgment in the trial court, which the court of appeals affirmed, finding no evidence of actual malice. *Id*.

We agreed that Foster was a public official for purposes of the *New York Times* actual-malice requirement, although we recognized the relative obscurity of Foster's office. *Id*. at 814. We noted the Supreme Court had "not reserved the 'public official' designation for high-level public officers alone." *Id*. We also recognized that "official conduct" under the *New York Times* rule did not merely include the official's performance of official duties but also the official's fitness for office, and we characterized the Supreme Court's view of the official-conduct concept as very broad. *Id*. at 814 & n.7.[5]

After acknowledging all this, we nonetheless reversed the summary judgment because of an unresolved fact issue. The fact issue existed because of the relative obscurity of Foster's office and the newspaper article's failure to expressly connect the defamatory content to Foster's official duties or fitness as county surveyor, raising a question whether Foster's community would infer a

---

[5] In a footnote, we summarized our understanding of the Court's position on the matter:

> In *Garrison v. Louisiana*, 379 U.S. 64 (1964), the Court stated: "The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant." 379 U.S. 64 at 77. Also, in [*Monitor*] *Patriot Co. v. Roy*, *supra*, the Court suggested that the "official conduct" concept has been substantially diluted: "Indeed, whatever vitality the 'official conduct' concept may retain with regard to occupants of public office, *cf. Garrison, supra*, 379 U.S., at 72 n.8, it is clearly of little applicability in the context of an election campaign." 401 U.S. 265 at 274.

*Foster*, 541 S.W.2d at 814 n.7 (parallel citations omitted).

9

connection. *Id*. at 815-16. We remanded the case to the trial court for a factual determination of whether Foster's community associated him with his public office, noting that

> [m]any public officials are so well-known in their communities that the general public automatically associates them with their official positions. In such instances an express reference in a newspaper article to the individual's official capacity is unnecessary and the reference is implied.

*Id.* at 815.

Employing similar logic, the court of appeals here noted that the article's failure to tie the defamatory statements to "Abraham's elected office, performance of duties related to that office, or his fitness for that office" requires reversal unless the connection can be implied. 474 S.W.3d at 736. The court then concluded that the connection could not be implied because the article was published on the internet, "an international forum," and no evidence existed "that Abraham is so well-known within that forum that 'the general public automatically associates . . . [him] with . . . [his] official position.'" *Id*. (alterations in original) (quoting *Foster*, 541 S.W.2d at 815). Finding no basis for an implied connection, the court remanded the case to the trial court, concluding that Abraham was not required to prove actual malice even if his local community might associate him with his office. *See id*. at 736 (noting that Abraham was relieved of proving actual malice even if "numbers within Abraham's immediate community . . . know him to be a school trustee").

*Foster*, however, says just the opposite. It says: "[A]n express reference in a newspaper article to the individual's official capacity is unnecessary and the reference is implied" for those public officials "so well-known *in their communities* that the general public automatically associates them with their official positions." *Foster*, 541 S.W.2d at 815 (emphasis added). The limited exception recognized in *Foster* was not tied only to the offending article's circulation, as the court

10

of appeals here suggests, but to its circulation within the public official's community. Thus, that the offending publication may circulate beyond the public official's own community does not diminish its effect within the official's community. As long as the circulation included the community in which the plaintiff is "so well-known . . . that the general public automatically associates [him] with [his] official position[]," *id*., the plaintiff's claim necessarily rests on reputational harm in that community, and the constitutional burden of showing malice must therefore apply. Moreover, the public official in *Foster* raised a fact issue regarding the libel's relationship to his office because of his office's obscurity. *Id*. at 815-16. The county-surveyor office had virtually no responsibilities, and it was likely the public knew nothing of the office even though it periodically appeared on the ballot. The public office at issue here is quite different.

School board trustees are accessible to the public; they are the public's link to public education. Unlike the county surveyor, they have many public responsibilities. They hire and fire superintendents, set the annual budget, negotiate and approve contracts, seek voter approval of bond packages, set goals, and generally establish a vision for the district. Their meetings are typically open to the public, and, as a board, they are accountable for the school district's performance. Abraham's office is thus a very public one.

According to his pleadings, Abraham is the longest serving member of the Canadian ISD board of trustees, being first elected in 2001. During this time, he has served as the board's president and vice-president. His pleadings further state he was born and raised in Canadian, Texas, he is the fourth generation of his family to live in the county, and he and his family are very involved in the community and its schools. His pleadings even disclose the remarkable statistic that at one time his

11

eight children amounted to 1% of the Canadian ISD student body.  Abraham also recites these facts in an affidavit included in the record.  His pleadings and affidavit thus indicate that the visibility of his office and his presence in his community are quite different from that in *Foster*.  *See id*. at 814 (noting that Foster had "very little public contact").  Moreover, Abraham's pleadings and affidavit are significant here because the TCPA identifies them as the primary "evidence" for determining whether a legal action should be dismissed under the Act.  *See* TEX. CIV. PRAC. & REM. CODE §27.006 (listing pleadings and affidavits as evidence the court "shall consider" but allowing additional limited discovery for good cause).

Although the *New York Times* rule speaks in terms of "public officials" and defamatory statements relating to their "official conduct," the Supreme Court has explained that "official conduct" includes not only official acts or omissions but also statements that relate to or touch on the person's fitness for office.  *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964).  The fact that a defamation injures not only the official's public reputation, but also his private reputation, does not render the *New York Times* rule inapplicable.  *Id*.  Further, the Supreme Court has adopted essentially a *per se* rule that *New York Times* applies to statements regarding criminal conduct lest debate about the statement's relationship to the official's conduct or fitness become "an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks,' which must be protected if the guarantees of the First and Fourteenth Amendments are to prevail."  *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971) (citations omitted) (quoting *New York Times*, 376 U.S. at 270).  Specifically, the Court has held "as a matter of constitutional law that a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness

12

for office for purposes of application of the 'knowing falsehood or reckless disregard' rule of *New York Times*." *Id.*[6] As we noted in *Foster*, "the United States Supreme Court has interpreted the 'official conduct' concept very broadly." *Foster*, 541 S.W.2d at 814.[7]

Relevant here again are Abraham's pleadings that characterize the defendants' false statements as defamatory per se because they insinuate that Abraham's conduct at Landtroop's campaign event was criminal. In his response to the motion to dismiss, for example, Abraham asserts that the defendants' false statements imply that he was guilty of criminal trespassing under section 30.05 of the Texas Penal Code or disrupting a meeting under section 42.05 of the Penal Code, or both, necessitating his forceful removal from the campaign event by the governor's DPS detail. Finally, instead of contesting his status as a public official, Abraham's original petition embraced it by including actual malice as an element of his defamation claim in apparent recognition that the *New York Times* rule applies. The evidence before the trial court thus makes clear that, unlike *Foster*, no fact issue remained as to application of the *New York Times* rule to Abraham's suit.

Because the court of appeals misapplied *Foster* and erroneously concluded that, as a matter of law, the *New York Times* rule does not apply here, we reverse its judgment. We remand the case

---

[6] *See also Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 300 (1971) (holding that "a charge of criminal conduct against an official . . . is always 'relevant to his fitness for office' for purposes of applying the *New York Times* rule").

[7] Other commentaries recognize the breadth of the Court's concept of official conduct. *See, e.g.*, 3 DAN B. DOBBS ET AL., THE LAW OF TORTS § 555 (2d ed. 2011) ("[W]hen it comes to public officials, almost anything is relevant to the public official's qualifications, including misbehavior that is remote in time or considered to be minor or purely personal by many people."); Joseph H. King, *Whither the "Paths of Glory": The Scope of the* New York Times *Rule in Defamation Claims by Former Public Officials and Candidates*, 38 VT. L. REV. 275, 297 (2013) ("[A] statement making a charge of criminal conduct seems virtually *per se* relevant to an official or candidate for the purposes of the *Times* rule."); Arlen W. Langvardt, *Media Defendants, Public Concerns, and Public Plaintiffs: Toward Fashioning Order from Confusion in Defamation Law*, 49 U. PITT. L. REV. 91, 137-39 (1987) (suggesting that nearly everything about an official's life bears on the public's view of fitness for office).

to the court of appeals, however, for review of Abraham's unaddressed issues,[8] including his complaints that the journalist's privilege and the TCPA, separately or in combination, violate the Texas Constitution by denying him due process and access to the courts. *See* TEX. CONST. art. I, §§16, 19.

The court of appeals' judgment is reversed and the case is remanded to that court for further review.

_____

John P. Devine
Justice

Opinion delivered: April 15, 2016

---

[8] Abraham also complained to the court of appeals about Greer's status as a journalist and the trial court's failure to rule on his objections to the assertions of journalist's privilege.