**Ed JOHNSON and Wife, Sue Johnson, Appellants,**

v.

**SOUTHWESTERN NEWSPAPERS CORPORATION, D/B/A Amarillo Globe Times, D/B/A Amarillo Daily News, D/B/A Amarillo Sunday News Globe, and Jim Lexa, Appellees.**

No. 07–91–0313–CV.

Court of Appeals of Texas, Amarillo.

May 27, 1993.

Rehearing Denied June 30, 1993.

Adkins & Fling, James C. Fling, Shamrock, for appellants.

Hull Towill Norman & Barrett, PC, David E. Hudson, Augusta, Gibson Ochsner & Adkins, Thomas C. Riney and Kenneth S. Muncy, Amarillo, for appellees.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.

REYNOLDS, Chief Justice.

Ed Johnson and wife, Sue Johnson, perfected this appeal from a take-nothing summary judgment rendered in their libel action against Southwestern Newspapers Corporation, d/b/a *Amarillo Globe Times*, d/b/a *Amarillo Daily News*, d/b/a *Amarillo Sunday News Globe*, and Jim Lexa, a sportswriter for the *Amarillo Daily News*. The appeal requires us to answer two decisive questions: First, does the summary judgment proof establish as a matter of law that Ed Johnson, a high school athletic director, head football coach, and classroom teacher, was a public official? Second, does the proof show a lack of actual malice in the writing and publication of the offending article? Deeming an affirmative answer to both questions is compelled by the record, we will affirm.

## BACKGROUND

At all relevant times, Ed Johnson (Johnson) was the athletic director, head football coach, and a classroom teacher at Shamrock High School, albeit he was employed by the Shamrock Independent School District under a teacher contract. As athletic director, Johnson was in charge of an athletic program consisting of approximately eighty-five athletes, and administered an athletic budget of approximately $23,000 per year. He purchased equipment and uniforms, scheduled games, arranged transportation, secured and compensated officials, and handled the maintenance of the athletic fields. He supervised the high school and junior high school boys and girls basketball coaches and the tennis coach, and operated a summer camp, teaching basketball and football to grade school children.

In addition, Johnson was the primary liaison between the school district and the Shamrock Booster Club. He met regularly with the booster club, reviewed game films with the club members, and informed the members of what additional equipment the athletic department needed.

On Tuesday, 13 November 1990, *The Amarillo Daily News* published on the front page of its "SPORTS" section an article written by Jim Lexa and entitled, "Shamrock has problems in grid program." The article, copied as an Appendix, was prompted by events following Claude's 14–13 victory over Shamrock in the preceding Friday's football game when, Lexa reported, "Shamrock, instead of just exchanging handshakes and heading toward the visitor's locker room, began a brawl that witnesses said needed 30 to 40 adults to break up."

Lexa, who never attended a Shamrock game or discussed the events with Johnson, based his article on conversations with the managing editor of the *Claude News*, the parent of a Claude football player injured in the brawl, the Claude coach, and other coaches, some of whom were quoted. In the article, Lexa described injuries suffered by Claude players, stated it "isn't the first time something of this nature had happened under an Ed Johnson-coached Shamrock team," recounted other happenings, and commented on the situation.

Among the other comments expressed by Lexa, these comments were made in the order of their appearance in the article:

Concerning Shamrock's high school football program, there's only one conclusion to draw after the last two seasons: Shamrock football coach and athletic director Ed Johnson turns his back on wrong doings and is slow in correcting them.

\*   \*   \*   \*   \*   \*

Clearly, Shamrock's board of trustees needs to act.

\*   \*   \*   \*   \*   \*

He can sweet-talk to his school board members, but he can't sweet-talk to the

coaches and media throughout the Panhandle. Many area coaches believe Johnson's (sic) a detriment to high school athletics.

\* \* \* \* \* \*

Unfortunately, five teams are trapped in District 1–1A with Shamrock and must play the Irish. Unfortunately, if Johnson is still coaching the Irish gridders next season, those five coaches again will have to instruct their players not to turn their backs on the Irish.

The Johnsons, alleging the quoted comments of Lexa were libelous per se, totally false, malicious, and made for the purpose of ruining Johnson's coaching career, initiated the libel action underlying this appeal.

After answering and conducting discovery, the defendants, collectively referred to as the Newspaper, moved for summary judgment. The grounds for judgment expressly presented in the motion were (1) the contents of the article are not false statements of fact, or are constitutionally protected statements of opinion; and (2) Johnson is a public official and a local public figure, who cannot recover without proving actual malice, a lack of which is demonstrated. In support of its motion, the Newspaper offered the affidavits of Lexa, Jon Mark Beilue, sports editor of the newspaper, and David Stephens, assistant sports editor of the newspaper, to show lack of malice; and the admissions, answers to interrogatories, and the deposition of Johnson on file.

The Johnsons responded, contending Ed Johnson was not a public official or a public figure, and only had to prove negligence, rather than actual malice. The response was accompanied by the affidavits of Johnson and an attorney, who saw the Shamrock–Claude ball game, the essence of which were that if Lexa had conducted a reasonable investigation, he would have known that the defamatory statements in the article were false.

Considering the summary judgment record and the arguments of counsel, the trial court, finding that Johnson is a public official, granted the Newspaper's motion for summary judgment, and decreed that the Johnsons take nothing. On appeal, the Johnsons' sole-point contention is that the court erred in granting the summary judgment.

Pressing their point, the Johnsons submit that Ed Johnson is neither a public official, as found by the trial court, nor a public figure, or at least a fact issue exists with respect to his status, and that the opposing affidavits create an unresolved fact issue as to malice. Replying, the Newspaper represents that the summary judgment evidence shows as a matter of law that Johnson was either a public official or a public figure, and the absence of malice.

## SCOPE OF REVIEW

Whether the evidence does or does not show Ed Johnson to be a public figure is of no moment, for the trial court grounded its take-nothing summary judgment on the expressed finding that he was a public official, thereby impliedly finding no malice on the part of the Newspaper. We, therefore, limit our consideration to the grounds upon which the summary judgment was granted, *Delaney v. University of Houston*, 835 S.W.2d 56, 58 (Tex.1992), and will uphold the judgment only if the Newspaper conclusively proved Ed Johnson was a public official and the absence of malice on its part, the essential elements of its defense expressly presented to the trial court. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex.1979).

In reviewing the summary judgment record, we are mindful that the Newspaper has the burden to show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. In determining whether there is a disputed material fact issue, we will accept the evidence favorable to the Johnsons as true. We also will accord the Johnsons every reasonable inference from the evidence, and will resolve any doubts in their favor. *Nixon v. Mr. Property Management*, 690 S.W.2d 546, 548–49 (Tex.1985).

## ISSUES

### 1. Public Official

In *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d

686 (1964), the United States Supreme Court, considering the limitation of the constitutional protections of free speech and free press upon a recovery by an elected official in a libel action, formulated the rule that

> prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

376 U.S. at 279–80, 84 S.Ct. at 726. For the purposes of the rule, the Court deliberately did not define "public official," nor decide to what extent the designation would descend into government ranks, nor determine the boundaries of the "official conduct" concept. 376 U.S. at 283 n. 23, 84 S.Ct. at 727–28 n. 23.

The "public official" designation was explained in *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), when the Court considered a libel action brought by a former nonelected supervisor, employed by county commissioners, against a newspaper. Weighing competing values of (1) a strong interest in debate on public issues and about persons who are in a position to influence their resolution, and (2) society's pervasive and strong interest in preventing and redressing attacks upon reputation, the Court concluded that the "public official" designation does not apply to all government employees, but applies where

> a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees.

383 U.S. at 86, 86 S.Ct. at 676. The *New York Times* rule and the *Rosenblatt* "public official" designation have been applied in Texas libel actions involving a public official. *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (Tex.1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977).

■■ Applying the principles here, we first observe that it was for the trial judge to initially determine whether the summary judgment proof showed Ed Johnson was a public official. *Rosenblatt v. Baer*, 383 U.S. at 88, 86 S.Ct. at 677; *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d at 816 n. 10. We agree with his finding that the summary judgment evidence conclusively established that Johnson was a public official.

■ Our agreement is not based on Ed Johnson's status as a school teacher, for we do not hold, and no Texas case has held, that a school teacher is a public official. *Poe v. San Antonio Exp.–News Corp.*, 590 S.W.2d 537, 540 (Tex.Civ.App.—San Antonio 1979, writ ref'd n.r.e.). Courts of other states are not of one mind; some have held that a school teacher is not a public official, *see, e.g., Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277, 362 S.E.2d 32, 37 (1987), *cert. denied*, 486 U.S. 1023, 108 S.Ct. 1997, 100 L.Ed.2d 228 (1988) (no showing that a public high school teacher was a public official); *Franklin v. Lodge 1108, Benevolent, Etc.*, 97 Cal.App.3d 915, 159 Cal.Rptr. 131, 137 (1979) (a school teacher is not a public official); while other courts have concluded that teachers are public officials. *See, e.g., Kelley v. Bonney*, 221 Conn. 549, 606 A.2d 693, 710 (1992) (a public school teacher is a public official for defamation purposes); *Luper v. Black Dispatch Pub. Co.*, 675 P.2d 1028, 1031 (Okla.App.1983) (plaintiff was a public official by virtue of position as a public school teacher); *Sewell v. Brookbank*, 119 Ariz. 422, 425, 581 P.2d 267, 270 (1978) ("As far as the law of defamation is concerned, teachers are 'public officials.' ").

But Ed Johnson was more than a school teacher; he also was the athletic director and head football coach. This dual position was, so the record reveals, of such apparent importance that the public had an independent interest in the qualifications and performance of the person who occupied the positions, beyond the general public interest in the qualifications and performance of all government employees.

As revealed by the record, Johnson's position of and activities as athletic director, earlier detailed, show that he was vested with and exercised significant governmental responsibility on behalf of the school district in his sole operation of the athletic department. As head football coach, Johnson filled a position of such importance that the public not only had, but exhibited, an independent interest in his qualifications and performance, transcending any interest shown in other employees of the school system.

Although Shamrock High School's enrollment of approximately 130 students was not large, Johnson acknowledged that high school football is one of the major things the people look forward to, being something in which they are keenly interested and which is extremely important to them. He also acknowledged that as a coach, he felt a lot of pressure for his teams to succeed.

Prior to accepting his position with the Shamrock school system, Johnson had been the head football coach at Phillips High School, and many newspaper stories were published about him and his teams, together with pictures of him and statements attributed to him. During Johnson's tenure at Shamrock, a nearby radio station broadcast the school's football games. Stories concerning him and the football program appeared in the Amarillo newspapers, in the Pampa newspaper, in the Dallas Morning News, and in the Shamrock Texan, the local newspaper which covered the program. In connection with the stories printed in the Panhandle newspapers, his comments were often quoted, sometimes at length, and pictures of him frequently appeared. Indeed, Johnson volunteered that he was as well known as anybody in the Panhandle.

In brief, the record affirmatively supports the trial court's finding of Johnson's status. He had substantial responsibility for and control over the conduct of governmental affairs, *i.e.*, the athletic department of the school system. And he had contact with the public concerning his official duties to the extent and degree that it generated an interest in his qualifications and performance independent of, and far greater than, the public's interest in the qualification and performance of all government employees. Moreover, his position was one which invited public scrutiny and discussion of him entirely apart from the scrutiny and discussion occasioned by the Newspaper's article. These circumstances establish that Ed Johnson was a public official. *Rosenblatt v. Baer*, 383 U.S. at 85–86, 86 n. 13, 86 S.Ct. at 676, 676 n. 13.

### 2. Actual Malice

■ Given Ed Johnson's status as a public official and the fact that the Newspaper's article related to his official conduct, the Johnsons cannot recover damages for a defamatory falsehood unless they prove the falsehood was made with actual malice, *i.e.*, made with knowledge that it was false or with reckless disregard of whether it was false. *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725. Then, to merit the summary judgment rendered, the Newspaper had to conclusively negate actual malice, the remaining element of the defense presented to the trial court. *Casso v. Brand*, 776 S.W.2d 551, 555 (Tex.1989); *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d at 678.

■ To negate actual malice, the Newspaper submitted the affidavits of Lexa, Beilue, and Stevens. Lexa, the author of the article, stated he believed its contents were factually correct; he did not include anything he believed, or even suspected, was false; the factual statements were based on reliable, identified sources; and he based his opinions on those facts. Beilue, who edited the article, said he believed its contents to be factually correct and he did not notice anything in the article which he believed, or suspected, to be false. Stevens echoed the statements in Beilue's affidavit. All three newspapermen disclaimed a personal acquaintance with Ed Johnson, and denied any ill will toward him and his family. Before the court also was Ed Johnson's affidavit in which he stated he had no

reason at all to think that Lexa had any vendetta or ill will against him.

This summary judgment proof established as a matter of law that the defendants believed the comments in the article were factually correct and not false, and that they did not act with reckless disregard as to their truth or falsity in writing and publishing them. In the absence of controverting proof, the evidence is sufficient to negate actual malice. *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex.1989); *Casso v. Brand*, 776 S.W.2d at 559.

■ The Johnsons propose that controverting proof sufficient to raise a fact issue of actual malice was supplied by the affidavit of Ed Johnson, submitted in response to the Newspaper's motion for summary judgment, and by his deposition, wherein he stated he felt an inadequate investigation was done in regard to the article. However, the mere failure to inquire more fully into the accuracy of the statements in the article is insufficient to show actual malice. *St. Amant v. Thompson*, 390 U.S. 727, 732–33, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968); *Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 756 (Tex.1984); *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403, 406 (Tex.1969).

■ In making his affidavit, Johnson contradicted his earlier deposition statement that he had no reason at all to think Lexa had any ill will against him. Contained in the affidavit is the expression of his belief that Lexa and the other defendants were motivated in writing and publishing the article by ill will toward him and the Shamrock High School football program. He added, apparently as the reason for the ill will, that he believed the defendants failed to get any response from him regarding a previous newspaper article, titled "Unsportsmanlike conduct accusations aimed at Shamrock," and they "decided to try again." Still, as the Johnsons acknowledge, ill will is not actual malice. *St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325; *Casso v. Brand*, 776 S.W.2d at 558.

Then, the Johnsons have not pointed out to us, nor have we found, anything in the record tending to show that the Newspaper made a false and defamatory statement of fact with knowledge that it was false or with reckless disregard of whether it was false or not. It follows, and we hold, that under this record, the Newspaper established as a matter of law the absence of actual malice in the writing and publishing of the article.

### 3. Sue Johnson's Claims

■ Because the summary judgment proof established as a matter of law that Ed Johnson was a public official and the newspaper article was written and published without actual malice, Sue Johnson's claims, being wholly dependent upon his claims, may not be maintained. She has no independent cause of action for libel, for the article did not name her, did not concern her, and made no reference to her. *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 893 (1960).

## CONCLUSION

Accordingly, the Johnsons' sole point of error is overruled. The judgment of the trial court is affirmed.

## APPENDIX

### Shamrock has problems in grid program

A coach's job, ultimately, is to win games. But coaches also should be responsible for instilling character, sportsmanship and a sense of fair play in their players, no matter what sport.

If coaches can't help athletes mature, to show them the proper way to act in the public forum, then they should get out of the business.

When football players act like a bunch of thugs, like a street gang from Los Angeles instead of good ol' country boys from the Panhandle, then drastic measures need to be taken.

Concerning Shamrock's high school football program, there's only one conclusion to draw after the last two seasons: Shamrock football coach and athletic director Ed

Johnson turns his back on wrongdoings and is slow in correcting them.

### Another incident with Shamrock

On Friday, Claude beat Shamrock 14–13 in front of the home folks for its first district win in five seasons. But Shamrock, instead of just exchanging handshakes and heading toward the visitor's locker room, began a brawl that witnesses said needed 30 to 40 adults to break up. The Fighting Irish indeed.

Jason Cartwright, the *Claude News* managing editor, said according to Claude's game film, after the final play one Shamrock player immediately threw a punch at Claude's Scott Green and another Shamrock player body slammed a second Claude player.

Green also had his eyes gouged at and was taken to the Northwest Texas Hospital Emergency room.

"The (final) buzzer already had sounded," said Curtis Green, father of Scott. "He (Scott) just got pulled in among four or five Shamrock boys. From what I could see, there were two or three holding him down and another gouging his eyes. He was totally beat up.

"His eyes were so bad that we felt we had to go to the hospital. They found nothing wrong. But they (Irish) beat him to the ground."

### Scratch match for Claude

Scott Green is 6–0, 185 pounds, a pretty good-sized high schooler. If that incident had happened outside the local Allsup's, then I'm sure a police report would have been filed.

At least three other Claude players had scratches around their eyes from the Irish's constant attempts at eye gouging, Claude coach Stan Caffey said. One player wore a helmet shield.

"I told Coach Johnson that I can understand kids fighting, getting emotional and doing a little shoving," Caffey said. "But I can't understand helmet swinging and trying to permanently disable someone (with eye gouging)."

Emotions ran so high that the Irish were escorted out of Claude by law enforcement officials for their own safety, Caffey said.

Claude superintendent J.D. Hawthorne refused to comment on the situation or on what steps Claude may take concerning action with the University Interscholastic League until he talks with the Shamrock administration.

Shamrock superintendent Ron Gregory said he could not tell which team started the fight.

"I have talked to the (Claude) superintendent and principal concerning that," Gregory said. "And we've discussed those things here with our coaches and our administration, situations like that and how to avoid things of that nature. That's the way we're handling it here."

This isn't the first time something of this nature has happened under an Ed Johnson-coached Shamrock team.

Earlier this season, a Shamrock player was ejected from a game against Gruver for kicking an opponent. Also, a Shamrock assistant coach was ejected from the same game, according to an officials' written report of the game.

In the first scrimmage of the season against Mangum, Okla., after a hard but clean tackle, a Shamrock player started swinging at a Mangum player, who swung back, Mangum coach Roger Ford said. Quickly, an official broke things up and prevented further damage.

For the last 12 months, Johnson has cried, complained and joked to opposing coaches about how the Amarillo Globe-News has been out to get him.

A story that appeared in the Sunday News–Globe has just more than a year ago—Nov. 12, 1989, to be exact—detailed dirty tactics of Shamrock's football team. Several opposing coaches—Sunray's Danny Chisum, Clarendon's Mike Smith and Highland Park's Dwain York—went on record complaining about the Fighting Irish.

Four other coaches who played Shamrock a year ago confirmed Shamrock's tactics, but did not want their names used or to be quoted. Following that story, three

officials who worked games involving Shamrock called the Globe–News offices to back up allegations.

Only one coach whose team played Shamrock a year ago said the Irish played cleanly.

During the course of last season, *six* Shamrock players were ejected from games. Many schools can play for 20 years and not have six players ejected.

Following that story, the Globe–News received nearly two dozen letters to the editor supporting Shamrock, the football team and Coach Johnson. All but one was written by Shamrock residents—the other letter was written by one of Johnson's former assistants when both were coaching at Phillips High School.

Johnson said the complaints took place because Shamrock had its best season, at 6–3, since 1973. If the Irish were losers again, nothing would have been said, Johnson contended.

That doesn't wash this season. Shamrock finished at 3–6 after moving from 2–2A to 1–1A.

Caffey said Johnson refuses to think his team was at fault in Claude.

"Coach Johnson called and talked to me today (Sunday)," Caffey said. "He wants to put all of the blame completely on the officials. I just can't put all of the blame on the officials and I can't put all of the blame on us.

"There's no doubt in my mind that they (Irish) play dirty football. We feel real bad about it. We're real excited to get the victory, but the celebration was ruined for us by the fight. I feel sick about it. I have not felt good about it all weekend long.

"I believe that in high school athletics you need to be teaching sportsmanship and character, and winning comes way back behind those things."

Clearly, Shamrock's board of trustees needs to act. Gregory said the situation was going to be addressed in executive session at the school board's regularly scheduled Monday night meeting.

Gregory said the board members would be briefed on what happened and a discussion would take place concerning steps to prevent future incidences such as what happened at Claude.

Last season, it appeared that Johnson might be on his way out at Shamrock, but he told the board how things were going to change with his football program and all was forgiven.

It's apparent that no change has taken place. He can sweet-talk to his school board members, but he can't sweet-talk to the coaches and media throughout the Panhandle. Many area coaches believe Johnson's a detriment to high school athletics.

It can be argued that it takes two teams to tango, and if last weekend were an isolated incident, that might be true. But when it happens again and again and again, common sense would point a finger at only one team.

Shamrock's reputation is such now that many coaches do not want to schedule games against it.

Unfortunately, five teams are trapped in District 1–1A with Shamrock and must play the Irish. Unfortunately, if Johnson still is coaching the Irish gridders next season, those five coaches again will have to instruct their players not to turn their backs on the Irish.

And that's a sad situation in high school athletics.