TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00656-CV






Linda Cloud, Appellant


v.


Mike McKinney and Kathy Walt, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. GN203670, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING






O P I N I O N



 Our opinion and judgment issued on August 30, 2006, are withdrawn, and the
following opinion is substituted. 

 Shortly after a lottery commission employee filed a complaint against the lottery
commissioner (Walter Criner), the governor's former chief-of-staff (Mike McKinney) set up a
meeting with the executive director for the lottery (Linda Cloud). When Cloud was later questioned
by a reporter about the allegations against Criner, she told the reporter that she did not know about
the allegations against Criner and that she had not discussed the matter with anyone in the governor's
office. However, when she later testified before the Sunset Commission, Cloud stated that she had
discussed the allegations against Criner with "the governor's office." The reporter then questioned
McKinney and other employees of the governor's office regarding the meeting between Cloud and
McKinney. After reading their published answers, Cloud filed a defamation lawsuit against
McKinney. In addition, Kathy Walt, a spokesperson for Governor Perry's re-election campaign, told
a reporter, in response to a question about the defamation suit, that Cloud had lied repeatedly. 
Consequently, Cloud added Walt to her defamation suit. The district court granted summary
judgment in favor of Walt on the ground that there was no evidence that she made the statement with
actual malice. The court also granted summary judgment in favor of McKinney on the grounds that
he was immune from suit under the doctrines of sovereign immunity and official immunity. We will
affirm the judgments of the district court. 


BACKGROUND

 A lottery employee accused Criner of making improper sexual comments and contact. 
After the claim was made, the lottery commission's general counsel and another lottery employee
informed Cloud about the complaint. Shortly thereafter, McKinney set up a meeting with Cloud. 
McKinney contends that, during the meeting, they discussed Criner's resignation and the need to 
replace Criner. Cloud alleges that McKinney also discussed the details of the allegations against
Criner and that McKinney told her to keep the discussion secret in a manner that caused her
to feel threatened. 

 Several months after meeting with McKinney, Cloud was called to testify before the
Sunset Commission. At the hearing, she testified that she first became aware that there were
allegations against Criner after members of her staff informed her of them. She also stated, in
response to a question about whether she informed the governor's office of the allegations, that she
"had a conversation with the governor's office." Finally, contrary to her allegations in this case, she
testified that no one had ever instructed her not to discuss the allegations against Criner.

 Both before and after Cloud testified at the hearing, Jay Root, a reporter, questioned
Cloud about the allegations against Criner and subsequently published more than one newspaper
article concerning the Criner allegations. In his first article, Root wrote that Cloud declared that she
had not been informed about the allegations and that she had not discussed them with McKinney. 
In a subsequent article, Root wrote that Cloud initially stated that she had first indicated that she was
unaware of the allegations against Criner and that she had not discussed the matter with anyone in
the governor's office but then told a different story when she testified before the Sunset Commission. 
The article also related that when asked about the inconsistent stories and why she previously stated
that she had not talked to anyone in the governor's office, Cloud stated that the topic was sensitive
and that "[i]t put me in a bad position" and "[i]t wasn't something I felt comfortable talking about." 
In addition, the article commented that in response to a question regarding whether anyone in the
governor's office had pressured her to remain silent, Cloud responded "absolutely not."

 After writing these articles, Root questioned McKinney at a press conference called
for an unrelated matter, asking McKinney about the allegations against Criner and about his meeting
with Cloud. In a subsequent article, Root wrote:


Cloud's statements [to the Sunset Commission] were in direct conflict with those
made by . . . McKinney. Records obtained by the Star-Telegram show that
McKinney and Cloud met on Feb. 27 and discussed Criner's resignation, but
McKinney said Wednesday the allegations never came up.


"I wouldn't do that," McKinney said. "Frankly, she's hired help. He was on the
board. No matter what, I wouldn't talk to her about that."



 After the articles were published, Cloud resigned from her job, stating that she felt
that her integrity had been impugned by McKinney's denial of her assertion that they had discussed
the allegations against Criner. Around that time, in two other articles concerning the Criner
allegations and Cloud's resignation, two employees of the governor's office--Gene Acuna and Ray
Sullivan--were credited with stating that the Criner allegations were not discussed in the meeting
between Cloud and McKinney. After resigning, Cloud filed a defamation suit against McKinney
alleging that his statements were defamatory because they accused her of lying under oath before
the Sunset Commission. 

 After Cloud filed suit, another newspaper article was written by a different reporter,
discussing Cloud's defamation claim against McKinney. The reporter asked Walt, a spokesperson
for Governor Perry's re-election campaign, to comment on the defamation suit against McKinney. 
The article stated that Walt "said the sworn statement is a lie" and quoted her as saying that Cloud
had "'lied repeatedly.'" The article also stated that, when she made these comments, Walt noted
Cloud's previous statement to Root that the governor's office had not pressured her to lie regarding
the allegations against Criner. After the article was published, Cloud amended her petition to
add Walt to the suit.

 McKinney and Walt both filed motions for summary judgment, asserting that they
were entitled to relief under both traditional and no-evidence summary judgment standards. In her
motion, Walt contended that Cloud was unable to prove the necessary elements for a defamation
claim. Specifically, she argued that Cloud could not prove that the allegedly defamatory statement
was false or made with actual malice, arguing that a finding of actual malice was necessary because
Cloud was a public official. Although she primarily asserted no-evidence summary judgment motion
grounds, Walt also attached summary judgment evidence and argued that she had proven the truth
of her statements. In his motion for summary judgment, McKinney asserted that he was immune
from suit under the doctrines of sovereign immunity and official immunity. Further, McKinney
contended that Cloud could not prove the necessary elements for maintaining a defamation claim. 
The district court granted the motions in separate orders. In the first order, the court concluded that
there was no evidence of "actual malice" on Walt's part. In the second order, the court concluded
that McKinney was protected by the doctrine of sovereign immunity to the extent that he was sued
in his official capacity and by the doctrine of official immunity to the extent that he was sued in an
individual capacity. Cloud appeals, contending that the trial court erred by granting the motions for
summary judgment. 


STANDARD OF REVIEW

 When a trial court specifies the grounds upon which summary judgment is granted,
summary judgment can only be affirmed if the grounds relied upon are meritorious; otherwise, the
case must be remanded. State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 381-82 (Tex. 1993).

A traditional motion for summary judgment must be granted if the evidence shows that "there is no
genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." 
Tex. R. Civ. P. 166a(c); Little v. Texas Dep't of Crim. Justice, 148 S.W.3d 374, 381 (Tex. 2004). 
The movant bears the burden of proving that there is no genuine issue of material fact. See
Tex. R. Civ. P. 166a(c); SAS Inst., Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005).

 In reviewing a motion for summary judgment, an appellate court must take the
nonmovant's evidence as true, indulge every reasonable inference in favor of the nonmovant, and
resolve all doubts in favor of the nonmovant. Little, 148 S.W.3d at 381. If a defendant conclusively
negates at least one element of the plaintiff's cause of action, then he is entitled to
summary judgment. Id.

 A party may move for summary judgment under rule 166a(i) on the ground that there
is no evidence of one or more essential elements of a claim or defense on which an adverse party
would have the burden of proof at trial. Tex. R. Civ. P. 166a(i). Unless the nonmovant produces
summary-judgment evidence raising a genuine issue of material fact on the challenged elements, the
court must grant the motion. Id. The reviewing court must view the evidence in a light that tends
to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. 
Minyard Food Stores, Inc. v. Goodman, 80 S.W.3d 573, 577 (Tex. 2002). When the evidence
offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of
its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. See Ford Motor
Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if
the evidence rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions. Id.


DISCUSSION

Immunity

 Before addressing the merits of this case, we need to resolve an issue raised by the
parties concerning the capacity in which McKinney was sued. A plaintiff may sue a governmental
employee in his official capacity, in an individual capacity, or in both capacities. Nueces County v.
Ferguson, 97 S.W.3d 205, 213 (Tex. App.--Corpus Christi 2002, no pet.); Denson v. Texas Dep't of
Criminal Justice-Inst. Div., 63 S.W.3d 454, 460 (Tex. App.--Tyler 1999, pet. denied). A suit
against a governmental employee in his official capacity is essentially a suit against the governmental
agency the person works for, rather than a suit against the individual. See City
of Hempstead v. KMIEC, 902 S.W.2d 118, 122 (Tex. App.--Houston [1st Dist.] 1995, no writ). On
the other hand, a suit against a governmental employee in his individual capacity seeks to impose
personal liability on the individual. Ferguson, 97 S.W.3d at 214; see City of San Angelo Fire
Dep't v. Hudson, 179 S.W.3d 695, 703 (Tex. App.--Austin 2005, no pet.). 

 The capacity in which the individual is sued affects the defenses to liability that may
be raised. Jackson v. Stinnett, 881 S.W.2d 498, 500 (Tex. App.--El Paso 1994, no writ). If an
individual is sued in his official capacity, the employee may raise any defense that would be
available to his employer, including the defense of sovereign immunity. Texas Parks & Wildlife
Dep't v. E.E. Lowrey Realty, Ltd., 155 S.W.3d 456, 458 (Tex. App.--Waco 2004, pet. filed);
KMIEC, 902 S.W.2d at 122. Individuals sued in their individual capacity, however, may not rely
on the defense of sovereign immunity but may raise the defense of official immunity. Ferguson,
97 S.W.3d at 215; Gonzalez v. Avalos, 866 S.W.2d 346, 349 (Tex. App.--El Paso 1993,
writ dism'd w.o.j.). 

 Cloud's petition does not explicitly state whether she was suing McKinney in his
official or in his individual capacity. However, on appeal, Cloud asserts that "it is clear that
McKinney was sued individually. Nowhere in Cloud's pleadings or discovery does she attempt to
sue McKinney in his capacity as a state official." (1) Accordingly, we will limit our discussion to the
defense of official immunity. 


Cloud's Claims Against McKinney

 Cloud insists that she was unaware of the details of the allegations against Criner until
she met with McKinney. In her affidavit, she claims that, during their meeting, she told McKinney
that she did not know the details of the allegations. She further asserts that, in response to her
statement, McKinney informed her, "in some detail," about the allegations. Specifically, she asserts
that McKinney told her that "if [Criner] had simply not grabbed [the employee], there would not be
an issue." She insists that, after making those statements, McKinney falsely denied discussing the
allegations on three separate occasions. 

 The first incident she complains of occurred when McKinney made the following
statement at an unrelated press conference in response to a question by Root: "I wouldn't do that .
. . . Frankly, she's hired help. He was on the board. No matter what, I wouldn't talk to her about
that." The second and third incidents occurred when McKinney allegedly made statements to his
aides, Acuna and Sullivan, indicating that the allegations against Criner had not been discussed. 
These statements were then relayed to reporters and printed in two separate articles.

 Cloud insists that because she testified before the Sunset Commission that she had
discussed the allegations with McKinney, McKinney's three statements contradicted her sworn
testimony and, therefore, constituted defamation per se because they accused her of lying under oath. 
See Knox v. Taylor, 992 S.W.2d 40, 50 (Tex. App.--Houston [14th Dist.] 1999, no pet.) (holding
that statement is defamatory per se if "it injures a person in his office, business, profession, or
occupation"). She further insists that because McKinney informed her of the allegations against
Criner at their meeting, he knew that the statements he made to Root, Acuna, and Sullivan were false
when he made them.

 Before addressing the merits of the case, we note that Cloud has failed to produce any
evidence linking Sullivan's statement to McKinney. In an article, Sullivan was credited with saying
that "there had been no mention of the allegations against" Criner. Although Cloud contested the
accuracy of the statement, she provided no evidence demonstrating that Sullivan made the statement 
after receiving information from McKinney. In fact, Cloud's affidavit and deposition seem to
indicate that Sullivan's statement was the result of his own direct, first-hand knowledge: in her
affidavit, Cloud specified that Sullivan was in the room for part of the meeting between her and
McKinney; and in her deposition, she characterized Sullivan "as a witness to some of the
conversation in" McKinney's office. 

 As the plaintiff, Cloud has the burden of proving that McKinney made a defamatory
statement to Sullivan. See Tex. R. Civ. P. 166a. She has failed to meet this burden. 

 As for the remaining statements, we must determine whether McKinney is protected
from liability by the doctrine of official immunity for the statements he made at the press conference
and to Acuna. Official immunity is an affirmative defense that shields public employees from
personal liability in order to encourage governmental employees to vigorously perform their jobs. 
Telthorster v. Tennell, 92 S.W.3d 457, 460-61 (Tex. 2002); see University of Houston v. Clark,
38 S.W.3d 578, 580 (Tex. 2000); City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). 
The purpose of the defense is to "protect public officers from civil liability for conduct that would
otherwise be actionable." Chambers, 883 S.W.2d at 653-54. As an affirmative defense, the burden
is on the defendant to establish the elements of the defense. Id. at 653. A governmental employee
is entitled to official immunity if he is (1) performing discretionary duties that are (2) within the
scope of his authority and (3) performed in good faith. Clark, 38 S.W.3d at 580; Chambers,
883 S.W.2d at 653. 


Discretionary Duty

 In determining whether McKinney is immune, we must first determine whether he
was performing a discretionary duty when the allegedly inappropriate actions occurred. 
Discretionary actions are entitled to protection under official immunity, but ministerial actions are
not. Ballantyne v. Champion Builders, Inc., 144 S.W.3d 417, 425 (Tex. 2003). An action is
ministerial if it is one that is defined with such precision that no discretion or judgment is left for the
actor. Id. In other words, if the official has to commit the action without any "choice in complying,
the act is ministerial." Id. However, if the action requires "personal deliberation, decision, and
judgment," then the action is discretionary. Id.

 Cloud does not contest that the actions she complains of were discretionary in nature. 
Moreover, formulating a response to a question inherently involves personal deliberation, decision,
and judgment and is, therefore, a discretionary act. 


Scope of Authority

 We must next determine whether McKinney was acting within the scope of his
authority when he made the statements at issue. If an official is engaging in a duty generally
assigned to him, then the official is acting within the scope of his authority. Id. at 424. 

 In his motion for summary judgment, McKinney submitted the affidavit of Donna
White, the Director of Administration for the Governor of Texas, which described the duties of the
chief-of-staff. As part of his job, the chief-of-staff is charged with the burden of acting as the
representative of the governor's office in interactions with "all federal, state and private entities" and
as a liaison to "the general public to exchange information [and] address concerns." Accordingly,
his job requires him to communicate with the public and the press regarding objectives and
operations of the governor's office and regarding matters affecting the entire state.

 It was in this capacity that McKinney met with Cloud to discuss the resignation of
the lottery commissioner and then later made the allegedly defamatory statements. The statements
he made concerned the circumstances surrounding the resignation of a high-ranking public
official--a matter of great public interest--and were given in response to inquiries by reporters
seeking to inform the public about the issue. Making statements concerning personnel matters falls
well within the chief-of-staff's official duties. Therefore, McKinney was acting within the scope of
his authority when he made the statements at issue in this case. 

Good Faith

 Finally, we must determine whether McKinney has demonstrated that the allegedly
improper actions were performed in good faith. Courts examine "good faith" in this context against
a standard of objective legal reasonableness, without regard to the employee's subjective state of
mind. See Wadewitz v. Montgomery, 951 S.W.2d 464, 466 (Tex. 1997). To establish good faith,
the employee must show that a reasonably prudent employee, under the same or similar
circumstances, could have believed that his conduct was justified based on the information he
possessed when the conduct occurred. Telthorster, 92 S.W.3d at 465; see Chambers, 883 S.W.2d at
656. It is not necessary that the employee prove that it would have been unreasonable to take
different action nor that all reasonably prudent officials would have acted as he did. 
Perry v. Grenias, 95 S.W.3d 683, 697 (Tex. App.--Houston [1st Dist.] 2002, pet. denied). A
plaintiff attempting to controvert the employee's summary-judgment evidence on good faith must
show that no reasonable person in the employee's position could have thought that the facts justified
the employee's actions. Id. at 697.

 We first address McKinney's statements at the press conference. To determine
whether McKinney is entitled to the protection of official immunity for making this statement, we
must consider the circumstances in which it was made. See Telthorster, 92 S.W.3d at 465 (courts
must consider circumstances of action); Ezrailson v. Rohrich, 65 S.W.3d 373, 376
(Tex. App.--Beaumont 2001, no pet.) (holding that in defamation case, courts should consider
statement in context it was given). In her deposition, Cloud admitted that she did not know the
specific question that was asked by Root, nor did she know the context in which McKinney's
statement was made. The only evidence presented concerning the surrounding circumstances comes
from the uncontroverted testimony by McKinney in his deposition. See Tex. R. Civ. P. 166a(c)
(providing that summary judgment may be based on uncontroverted testimony of interested party). 
In his deposition, he testified that he made the allegedly defamatory statements at a press conference
called for a different topic and that the statements were made in response to an "unexpected"
question from Root as McKinney was leaving the podium. When McKinney was asked about the
press conference, the following exchange occurred:


A: I never said the allegations didn't come up. That's Mr. Root's writing. It's not
in quotes.


Q: What were you referring to when you said, "I wouldn't do that. Frankly, she's
hired help. He was on the board. No matter what, I wouldn't talk to her about that"? 
What were you referring to?


A: It was in response to a question from Mr. Root.


Q: What was the question?


A: The question from Mr. Root was unexpected. We were talking about--I mean,
I was at a press conference about homeowners' insurance or something, something
totally unrelated, and frankly hadn't thought about it in six or seven months.


 And he asked me--the question directly was, "Did Linda Cloud lie to
Chairman Gallegos?" That was the question. And again, I mean, I was walking off
at the time and he asked me that question. "Did Linda Cloud lie to Chairman
Gallegos?"


 And I said, "I don't know. What did she say?"


 And he said, "She said you were the one who told her about the Walter
Criner's allegations."


 And I said, "I didn't do it and wouldn't do that."


. . . .


A: He asked me if she lied is what he asked me, and I truthfully answered I didn't
know.



 Given the preceding, we must determine whether McKinney has shown that a
reasonably prudent employee, under the same circumstances, could have believed that his response
to the question of whether he was the individual who told Cloud about the allegations was justified. 
In her sworn affidavit, Cloud stated that she first learned of the allegations against Criner from two
employees working for the lottery. This assertion is confirmed by Cloud's testimony before the
Sunset Commission; in response to a question about how she learned of the allegations, Cloud
testified, "My security director and my internal counsel made me aware of it." 

 In light of this, a reasonable employee could have believed that the response given
to Root's question was justified. The response could reasonably be interpreted as simply an assertion 
that he was not the individual who first told Cloud about the allegations, which, according to Cloud's
own sworn testimony, was a true statement. 

 Because McKinney satisfied his burden, the burden shifted to Cloud to produce
evidence that no reasonable official in McKinney's position could have believed that his statement
was justified. In support of her assertions, Cloud refers to various statements made by McKinney
in his deposition, admitting that "the subject of the allegations against Criner did come up" during
the meeting on two occasions: when he asked Cloud at the beginning of their meeting if she had
heard about the incident involving Criner, and when he told her that Criner "was guilty of poor
judgment--in fact, I said he's guilty of poor judgment until he grabbed his arm--grabbed her arm,
and then I don't know what he's guilty of." Although Cloud stated that McKinney "gave [her] the
details" and "began talking in some detail about the complaint" against Criner, she only lists two
statements relating to the allegations in her affidavit: (1) the statement in which McKinney stated
Criner was guilty of poor judgment, and (2) a statement McKinney allegedly made in which he said
that he did not believe the allegations against Criner. However, this evidence does not meet the
burden of showing that a reasonable official could not have believed that McKinney's response was
justified in light of the question asked by Root: whether McKinney was the individual who told
Cloud about the allegations against Criner.

 Even if McKinney's statements were interpreted in the manner suggested by
Cloud--as a denial that McKinney ever mentioned the allegations to Cloud--McKinney's
statements could not be viewed as accusing Cloud of perjury. In her testimony before the
Commission, Cloud made no mention of McKinney. Although she did mention "a conversation with
the governor's office" twice, both statements were made in response to a question about whether
Cloud had informed the governor's office about the allegations. Accordingly, McKinney's responses
do not contradict any statement made by Cloud before the Sunset Commission. 

 We now address the statement made to Acuna. In response to a question from a
reporter about the allegations against Criner, Acuna stated, "It was not discussed." The context of
this statement was explained by Acuna in his deposition. In his testimony, he explained that Root
called him to get a response to Cloud's assertion that the allegations had been discussed during the
meeting between Cloud and McKinney. Before giving a comment, Acuna checked with McKinney,
who told Acuna that "it was not discussed." Acuna then relayed McKinney's comments to Root, and
the comments were subsequently published in an article.

 As described previously, it is necessary to consider the circumstances in which the
allegedly defamatory statement was made in order to determine whether McKinney is entitled to the
protection of official immunity. In his deposition, McKinney stated that the purpose of the meeting
with Cloud was to inform her that Criner had resigned and to talk about finding a replacement. He
testified that they talked about how Criner had prepared a letter of resignation and would quickly be
resigning from his position. He further testified that it was going to be his job to search for a suitable
replacement for the commissioner and that he asked Cloud for her input. Specifically, he wanted
input regarding what qualifications would be the most helpful in a replacement. Additionally, he
said that they talked about the lottery's general counsel because he was concerned that Cloud might
not be getting good legal advice. Finally, as mentioned before, he admitted that the subject of the
allegations came up on two occasions. 

 Cloud's affidavit confirms that many of these topics came up during the meeting, and
she admitted in her deposition that the "bulk" of the meeting consisted of talking about topics other
than the details of the allegations against Criner. Further, Cloud related that she "remained silent,
listening" in response to McKinney's statements and that she actually said very "little" during the
meeting. She also admitted that the only "substantive exchange of information" concerning the
allegations was McKinney's communication that Criner had grabbed the employee's arm.

 In light of the preceding evidence, we conclude that a reasonably prudent official, in
the same circumstances, could have believed that stating that the allegations were not "discussed"
was justified. The word "discuss" means "[t]o speak together about" and "involves close
examination of a subject with interchange of opinions, and need not imply disagreement." 
American Heritage Dictionary of the English Language, New College Edition 377 (1980). Both
parties agree that the main topics of conversation during the meeting did not involve the allegations
against Criner. Moreover, when describing her reaction to McKinney's allegedly defamatory
statements, Cloud characterizes herself as a recipient of information, not an active participant in a
conversation. Because McKinney satisfied his burden, the burden shifted to Cloud to produce
evidence that no reasonable official in McKinney's position could have believed that his statement
was justified. In support of her claim, Cloud refers to the evidence previously described in which
McKinney admitted that the subject of the allegations came up during the meeting and to the
statements in her affidavit claiming that McKinney mentioned the allegations on
more than one occasion. 

 In light of the definition of the word "discuss," Cloud's characterization of her
participation in the meeting, and the descriptions of the meeting, we cannot conclude that these
assertions constitute evidence that it would not have been possible for a reasonable employee to
conclude that, under the circumstances, the statement "the allegations were not
discussed" was justified. 

 For all the reasons previously given, we conclude that McKinney proved that he acted
in good faith and that Cloud failed to raise a fact issue with respect to good faith. Because
McKinney has proved all the elements of official immunity, we hold that he is immune from suit and
cannot be held liable for the allegedly defamatory statements he made. Therefore, we affirm the
district court's grant of summary judgment on the grounds of official immunity. 


Walt's Summary Judgment

 In her second issue, Cloud asserts that the district court also erred in granting Walt's
motion for summary judgment on the ground that there was no evidence indicating that Walt made
the statement with actual malice. Cloud asserts that by stating that Cloud had "lied repeatedly" and
telling a reporter that her sworn statement was a lie, Walt accused Cloud of perjury and defamed her. 
Cloud argues that, even assuming she was a public official at the time the statement was made, Walt
made the statements with actual malice.

 In order to succeed in a defamation claim, a plaintiff must prove that the defendant
"(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with
either actual malice, if the plaintiff was a public official or public figure, or negligence, if the
plaintiff was a private individual, regarding the truth of the statement." WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998). In this context, actual malice refers to the
defendant's attitude toward the truth of what he said. See id. at 573. Actual malice means that the
defendant made the statement knowing that it was false or with reckless disregard about whether the
statement was false or not. HBO v. Harrison, 983 S.W.2d 31, 36 (Tex. App.--Houston [14th Dist.]
1998, no pet.). To establish recklessness, the plaintiff must prove the defendant "entertained serious
doubts as to the truth of his publication." WFAA-TV, 978 S.W.2d at 574. 

 Two prerequisites must be met for the actual malice standard to apply. First, the
plaintiff must be a public official for the purposes of the published statements, and second, the
allegedly defamatory statements must relate to the plaintiff's official conduct. HBO,
983 S.W.2d at 36. Walt's statements referred to actions that Cloud had engaged in as the Lottery
Director, and, therefore, satisfied the second requirement. Regarding the first requirement, the
determination of whether an individual is a public official is a question of law for the court to decide. 
See WFAA-TV, 978 S.W.2d at 571. Not all governmental employees qualify as public officials, and
there is no specific test for determining whether an individual is a public official. HBO,
983 S.W.2d at 36. However, public official status does apply to governmental employees "'who
have, or appear to the public to have, substantial responsibility for or control over the conduct of
governmental affairs'" and to an employee holding an office of "'such apparent importance that the
public has an independent interest in the qualifications and performance of the person who holds it,
beyond the general public interest in the qualifications and performance of all government
employees.'" Id. (quoting Rosenblatt v. Baer, 383 U.S. 75, 85-86 (1966)). 

 The executive director of the lottery commission has "broad authority" and exercises
control and supervision over all lottery games in Texas. Tex. Gov't Code Ann. § 466.014(a)
(West 2004). As part of her job, the director has enforcement and collection powers and has the
authority to (1) hire people to work for the commission, including security officers; (2) enter into
contracts for supplies; (3) employ a certified accountant to audit lottery transactions and accounts;
(4) investigate violations of the Lottery Act; and (5) maintain a security department and appoint
someone to run it. Id. §§ 466.014(b), (c); .017(a); .019(a), (b); .020(a), (b) (West 2004). Based on
the broad authority given to the position, we conclude that the executive director has substantial
responsibility over the conduct of governmental affairs and is, therefore, a public official. Cf. Foster
v. Laredo Newspapers Corp., 541 S.W.2d 809, 814 (Tex. 1976) (holding that although county
surveyor was in lower echelon of governmental employees, he is still considered public official);
Johnson v. Southwestern Newspapers Corp., 855 S.W.2d 182, 186-87 (Tex. App.--Amarillo 1993,
writ denied) (holding that teacher who was also athletic director is considered public official);
Villarreal v. Harte-Hanks Communications, Inc., 787 S.W.2d 131, 133-35 (Tex. App.--Corpus
Christi 1990, writ denied) (holding that child protective services specialist, whose duties consisted
of investigating allegations of child abuse, is considered public official). 

 Cloud asserts that, prior to making the allegedly defamatory statements, Walt did
nothing to determine the truthfulness of her statements and, therefore, made the statements with
reckless disregard as to their truth. Specifically, Cloud contends that Walt did not discuss the
defamation suit with the individuals who were present during the meeting. Further, Cloud argues
that, because the statements in her affidavit were true, Walt's statement was false and defamatory. 
As proof of this assertion, Cloud refers back to the evidence described in the previous section as
proof that the Criner allegations were discussed in her meeting with McKinney. 

 However, the fact that Walt did not check with McKinney or Cloud prior to making
the statements does not mean that Walt made the statement knowing that it was false or with reckless
disregard as to the truth of the statement. In her affidavit, Walt stated that her statements were based
in part on Cloud's previous admissions that she had lied. It is undisputed that Cloud lied to Root
when she told him how she learned of the allegations against Criner. In her affidavit, Cloud admits
that she told Root that she learned of the allegations against Criner by reading about them in the
newspaper, which was a false statement. 

 Additionally, the article concerning the defamation suit against McKinney stated that,
when Walt made the statements, she also noted that Cloud had previously told Root that no one had
pressured her to lie about the Criner allegations--a statement Cloud also made to the Sunset
Commission. However, these statements are inconsistent with statements in Cloud's petition and
in her affidavit that McKinney had instructed her not to discuss the matter. 

 Further, none of the evidence referenced relates to whether Walt made the allegedly
defamatory statements with actual malice or relates to Walt's state of mind when she made the
statements. Cloud did not depose Walt and does not contend that she was deprived of the
opportunity to obtain evidence regarding Walt's state of mind. 

 Given that this was a no-evidence summary judgment, that Cloud failed to provide
evidence regarding Walt's mental state, that Cloud admitted lying to Root, and that statements in
Cloud's affidavit are inconsistent with her testimony before the Sunset Commission, we cannot
conclude that the district court erred when it granted the summary judgment motion on the ground
that there was no evidence Walt's statements were made with actual malice. Accordingly, we affirm
the no-evidence summary judgment granted in favor of Walt. 


CONCLUSION

 Because we have concluded that the district court did not err in granting a traditional
summary judgment in favor of McKinney or in granting the no-evidence summary judgment in favor
of Walt, we affirm the judgments of the district court. 



 

 David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed on Motion for Rehearing

Filed: May 18, 2007
1. McKinney, on the other hand, asserts that the course of proceedings demonstrates that
Cloud sued him in his official, not his individual, capacity. See Nueces County v. Ferguson,
97 S.W.3d 205, 215 (Tex. App.--Corpus Christi 2002, no pet.) (when petition does not specify what
capacity government official sued in, courts look at the "'course of proceedings'" to determine nature
of suit (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985))). In support of this assertion,
McKinney points to an affidavit filed by Cloud stating that she had discussed Criner's allegations
with the "Governor's office" and to a statement Cloud made in her deposition admitting that
McKinney was acting in his official capacity when he made the statements at issue in this lawsuit.