

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-16-00320-CV

TIMOTHY CASTLEMAN AND CASTLEMAN CONSULTING, LLC, APPELLANTS

V.

INTERNET MONEY LIMITED D/B/A THE OFFLINE ASSISTANT AND KEVIN O'CONNOR, INDIVIDUALLY, APPELLEES

On Appeal from the 237th District Court
Lubbock County, Texas
Trial Court No. 2016-519,740, Honorable Les Hatch, Presiding

October 18, 2018

MEMORANDUM OPINION ON REMAND

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

The trial court denied the motion of Timothy Castleman and Castleman Consulting, LLC (Castleman) to dismiss the defamation suit filed against them by Internet Money Limited d/b/a The Offline Assistant and Kevin O'Connor (collectively referred to as Offline). Castleman thought itself entitled to such relief per the terms of the "Texas Citizens Participation Act" (TCPA). TEX. CIV. PRAC. & REM. CODE ANN. § 27.01 *et seq.* (West 2015). We affirmed the decision on one ground mentioned by the trial court. Via *Castleman v. Internet Money Ltd.*, 546 S.W.3d 684 (Tex. 2018), the Supreme Court

disagreed with our decision, reversed and remanded the cause directing us to "consider Castleman's remaining issues." *Id.* at 691. Upon doing that, we again affirm the trial court's order denying dismissal.

*Background*

According to the limited record before us, the dispute arose from a commercial or business relationship between Castleman and Offline. The former retained the latter to help order and deliver products sold over the Castleman website. Allegedly, Offline failed to properly comply with instructions from Castleman about how to perform its tasks, which deviations purportedly resulted in Castleman experiencing lost profits. Offline responded by alleging that it had followed the instructions provided.

Eventually, Castleman posted on the internet comments about Offline's performance. For instance, it titled one of its blogs "Warning: Stay Away From The Offline Assistant Company & Kevin O'Connor" and wrote about the business relationship between the two, how he mentored O'Connor, how he "help[ed] [O'Connor] grow his business," and the controversy arising therefrom. That blog also contained allegations that 1) "[n]o one from [O'Connor's] company . . . reviewed *any* of the orders to ensure they were being done correctly despite his assurances they do quality control and project management on all jobs," 2) "[t]here was an 85% error rate by his staff in ordering products for us," 3) O'Connor "doesn't stand behind his employees['] work," and 4) Offline "has zero quality control or checks to ensure work is being done correctly." Through other internet avenues, Castleman stated that 1) his "goal [was] to protect other business owners from losing $8k or having to take a company to court like [he's] doing," and 2)

2

"[t]he fallout for this is going to be maybe 10 or 100 multiples of what this guy owes me, and none of it had to happen."

Offline deemed the comments defamatory, demanded their removal, and requested damages. So too did it sue Castleman when the latter refused Offline's demands.

Upon answering the petition, Castleman invoked the provisions of the TCPA and moved to dismiss the suit. According to Castleman, Tim Castleman had "the right to speak his mind on the behavior of companies and individuals with whom he [did] business. He has done so, and [Offline is] now trying to make him pay for it. But Castleman's statements [weren't] defamatory; they [fell] within no exception to the liberty of free speech that would allow a reasonable person to find them defamatory." Furthermore, the "Texas Citizens Participation Act" purportedly "protect[ed] him from [Offline's] attempts to impose upon him the cost of defending such a lawsuit."

The trial court denied the motion to dismiss and issued findings of facts and conclusions of law supporting its decision. Among other things, it determined that 1) "[t]he statements at issue arose out of the sale of goods, and the intended audience is actual or potential buyers or customers"; 2) Castleman's "statements were made with either the knowledge of their falsity or, at the very least, with reckless disregard as to their truth or falsity"; 3) Castleman "admitted their intent to harm [Offline] and acknowledged the damage their statements were causing [Offline]"; 4) Castleman failed to prove that "the legal action was based on, related to, or was in response to [Castleman's] exercise of the right of free speech, the right to petition, or of the right of association"; 5) "Defendant Castleman Consulting, LLC did not file a motion to dismiss under the Texas Citizens

3

Participation Act," only Tim Castleman"; and 6) Castleman's "acts fall within an exception to the Citizens Participation Act." Castleman appealed.

*Disposition*

Several issues remain for disposition. The primary one concerns whether the trial court properly denied the motion to dismiss. The trial court's findings and conclusions revealed several grounds upon which it acted. Obviously, the one upon which we relied in initially affirming ultimately proved wrong. The others now before us encompass whether 1) Offline established a prima facie case of defamation, and 2) whether Castleman established as a matter of law the truthfulness of the purportedly false statements. To those we add the need to determine whether Castleman Consulting, LLC was actually a party to the motion to dismiss and, if so, whether the movants were entitled to attorney's fees.

*Prima Facie Case*

We first consider the matter of a prima facie case. Again, Castleman moved to dismiss under § 27.005 of the Civil Practice and Remedies Code. The latter provides that "on the motion of a party . . . a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1)-(3). However, dismissal may not occur "if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c).

4

Reviewing a decision to deny a § 27.005 motion to dismiss implicates the de novo standard of review. *Patterson v. T.V. Channel 25 Broad. Station*, 489 S.W.3d 589, 591 (Tex. App.—Texarkana 2016, no pet.); *See Batra v. Covenant Health Sys.*, __ S.W.3d __, __, 2018 Tex. App. LEXIS 8215, at *15 (Tex. App.—Amarillo Oct. 9, 2018, no pet. h.). Furthermore, our review of the order is akin to that applicable when reviewing a summary judgment. That is, we consider the pleadings and evidence in a light most favorable to the nonmovant. *Batra*, 2018 Tex. App. LEXIS 8215, at *14-15; *E. Tex. Med. Ctr. Athens v. Hernandez*, No. 12-17-00333-CV, 2018 Tex. App. LEXIS 3921, at *5 (Tex. App.—Tyler May 31, 2018 pet. denied) (mem. op.); *Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 801 (Tex. App.—Austin 2017, pet. filed). So too do we assess whether the parties satisfied their respective burdens. Performing this task likens to swinging on a pendulum.

That is, we start with the movant. He, she, or it has the burden to prove the cause falls within the scope of the TCPA. *Greer v. Abraham*, 489 S.W.3d 440, 443 (Tex. 2016); *Batra*, 2018 Tex. App. LEXIS 8215, at *11-12. Once that is done, we swing in the direction of the nonmovant. To avoid dismissal, he, she, or it must establish by "clear and specific evidence a prima facie case" for each essential element of the claim in question. *Batra*, 2018 Tex. App. LEXIS 8215, at *12. Once that occurs, we tighten our grip as we swing back towards the movant to determine if he, she, or it established, by a preponderance of the evidence, any available defense. *Id.* at *13-14. The tether on which we swing consists of the pleadings and affidavits filed by the parties. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a) (requiring the court to "consider the pleadings and supporting and

opposing affidavits stating the facts on which the liability or defense is based"); *accord Batra*, 2018 Tex. App. LEXIS 8215, at *12 (stating that the trial court is statutorily required to consider all pleadings, and supporting and opposing affidavits stating the facts on which a claim of liability is based).

Here, we conclude that Castleman satisfied his initial burden. Section 27.001 applies to defamation actions. *See Greer*, 489 S.W.3d at 443. Additionally, the exception thought available to Offline was deemed unavailable in the Supreme Court's *Castleman* opinion. That said, our journey takes us to Offline and its burden.

The "clear and specific evidence" standard mentioned in § 27.005(c) neither imposes a higher evidentiary burden nor bars the use of circumstantial evidence. *Andrews Cty. v. Sierra Club*, 463 S.W.3d 867, 867 (Tex. 2015). Nonetheless, the evidence must have some degree of detail. *Schofield v. Gerda*, No. 02-15-00326-CV, 2017 Tex. App. LEXIS 4579, at *27 (Tex. App.—Fort Worth May 18, 2017, no pet.) (mem. op.). As said by the Supreme Court in *In re Lipsky,* 460 S.W.3d 579 (Tex. 2015), "pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." *Id.* at 591. So, the nonmovant's burden is satisfied when there exists of record the minimum amount of evidence needed to support a rational inference that the allegations of fact are true. *Id.* at 590. In other words, the record must contain sufficient evidence to support a rational inference that each element of the cause of action exists. With these rules in mind, we turn to the record and situation at bar.

Like most every cause of action, defamation has multiple elements. They consist of a false statement by the defendant to a third party, that defamed the plaintiff, which was uttered with the requisite degree of fault, and which caused damage. *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017); *Batra*, 2018 Tex. App. LEXIS 8215, at *18-19. Damages need not be proved if the statement was defamatory per se, however. *Bedford*, 520 S.W.3d at 904.

Regarding the element of a false statement, the question is whether the words spoken are reasonably susceptible of a defamatory meaning. *Dallas Morning News, Inc. v. Tatum*, __ S.W.3d __, __, 2018 Tex. LEXIS 404, at *9-10 (Tex. May 11, 2018). That is, the statement must be verifiably false and not merely an opinion masquerading as a verifiable fact. *Id.* We decide that by focusing on the statement's entire context. *Id.* But, again, it is not enough that the statement is false, it must also be defamatory. That entails an objective, as opposed to subjective, inquiry. *Id.* at *11-12. The inquiry is one of law, not fact, and implicates a two-step process. *Id.* Via the first, we decide if the meaning assigned to the statement by the plaintiff is reasonably capable of arising from its text, while the second obligates us to decide if that meaning is reasonably capable of defaming the plaintiff. *Id.*

In reviewing Castleman's brief, his challenge on appeal concerns the statements, whether they actually were opinions, and whether they were false. Little is said about the other elements of defamation. So, we begin with the contentions posed in the brief. As previously mentioned, the statements consist of Castleman telling others via the internet that 1) "[n]o one from [O'Connor's] company . . . reviewed any of the orders to ensure they were being done correctly despite his assurances they do quality control and project

7

management on all jobs," 2) "[t]here was an 85% error rate by his staff in ordering products for us," 3) O'Connor "doesn't stand behind his employees['] work," and 4) Offline "has zero quality control or checks to ensure work is being done correctly." Viewing the evidence in a light most favorable to Offline, we find evidence from which a rational factfinder could reasonably conclude that one or more of the utterances were false.

For instance, the record contains written electronic exchanges between O'Connor and Castleman wherein the latter accused Offline of wrongfully doubling orders to be sent to Castleman customers. It is this purported doubling of orders that resulted in the alleged "85% error rate," according to Castleman. Offline denied the allegation, informed Castleman that it was simply following the directions Castleman had provided it and forwarded to Castleman those directions. Furthermore, those directions revealed that each time a customer ordered one item Offline was supposed to order two. From Offline's viewpoint, it did exactly as directed by Castleman, and, in abiding by his directives, there could be no "85% error rate." Castleman rejected the explanation, demanded that Offline accept responsibility for the supposed error, demanded reimbursement for the expense of doubling the orders, and posted the aforementioned comments on various internet sites when O'Connor refused to accede to the demand.

Whether or not Castleman actually told Offline to double order items is not a matter we need to resolve, given the status of the case. Our task is only to determine if evidence appears of record (when construed in a light most favorable to Offline) that allows one to reasonably infer that the allegation about the "85% error rate" was false. Such evidence does. The accuracy of Castleman's representation about an "85% error rate" is dependent upon whether he had directed O'Connor to double each order. No other basis

for the error rate was assigned by Castleman. So, if O'Connor followed his instructions and, consequently, doubled the orders, there would be no "85% error rate," and the statement about the existence of such a rate would be false. O'Connor provided evidence of the instructions in question, the directive to double orders, and Offline's compliance with them. Thus, there is evidence that no such "85% error rate" existed and Castleman's contrary statement was false.

The same is also true about the statement that "[n]o one from [O'Connor's] company . . . reviewed any of the orders to ensure they were being done correctly despite his assurances they do quality control and project management on all jobs." The record contains evidence of personnel from Offline contacting a Castleman employee to inquire about the accuracy of an order. The Castleman employee told Offline that the particular order should not be doubled. This evidence belies the allegation that "no one from" Offline "reviewed any of the orders to ensure they were being done correctly." Simply put, evidence appears of record from which one can reasonably infer that at least two of the utterances Castleman published on the internet were false.

As for whether those falsehoods were defamatory, we note that falsehoods are defamatory if the words tend to injure the person's reputation, exposing him to hatred, contempt, ridicule, or financial injury, or if it tends to impeach the person's honesty, integrity, or virtue. *Hoskins v. Fuchs*, 517 S.W.3d 834, 840 (Tex. App.—Fort Worth 2016, pet. denied); TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (West 2017) (defining libel as a "a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's

honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury"). This said, we turn to the context of the misrepresentations. They were published on forums or internet sites containing viewers who knew him and who may have been likely to use the services of Offline and O'Connor. His expressed intent was to "warn" his readers and listeners against using the services of Offline and O'Connor by describing the quality, or lack thereof, of their work. The utterances and their entire context portrayed Offline and O'Connor as failing to perform, as breaching promises, and as being comparable to thieves by refusing to take responsibility for the supposed error. Third parties both read the comments and decided to eschew the business services offered by Offline and O'Connor. Moreover, in at least one instance, Castleman thanked a reader for deciding not to hire the subjects of his commentary. These circumstances connote effort to ascribe to O'Connor and his business the moniker of ineptness and untrustworthiness and he used falsehoods indicative of that. Such a meaning of his words and purpose reasonably arises from the falsehoods and their context. That he succeeded by actually dissuading others from hiring Offline and O'Connor upon their reading of the falsehood reveals that those falsehoods were reasonably capable of defaming O'Connor and Offline, that is, of exposing them to financial injury.

As for the verifiability of the statements, Castleman argues that they were not verifiable and that they were mere expressions of opinion. To reiterate what the Supreme Court said in *Dallas Morning News*, statements that are not verifiable as false are not defamatory. *Dallas Morning News, Inc.,* 2018 Tex. LEXIS 404, at \*46-47. And, even if susceptible to verification, they do not expose the speaker to liability if their entire context

10

discloses that they were not intended to assert a fact. *Id.* Finally, should they not be verifiable or intended to assert a fact, they are "called an opinion." *Id.*

Castleman's proclamations about Offline's error rate and lack of personnel to review orders began with an explanation of the basis for his statements. That basis consisted of 1) his accountant noticing a $7,897.68 loss "caused by Kevin O'Connor's Offline Assistant Company"; 2) Castleman or his subordinates perusing the last 100 orders placed by Offline for him; 3) uncovering the supposed "85% error rate"; 4) "dig[ging] deeper"; and 5) "pull[ing] our financial records from the store, the supplier, and match[ing] them to our credit card statements for them to get a full accounting of just how bad it was." He then described for his readers his effort to address the matter with Offline, which included a description of how he asked O'Connor to "explain why none of the orders were checked by his project manager (as promised when he signed up) or anyone else on his staff for accuracy" and "why they hadn't followed the spreadsheet directions" Castleman had provided. In alluding to his accountant's discovery and in describing a purportedly in-depth investigation involving the perusal of business records and confirmation of the supposed error, Castleman's words had a multifold effect. They revealed 1) that he purportedly verified the purported "85% error rate" as fact, 2) the statement purportedly was a verifiable fact, and 3) he intended his readers to believe the statement was verifiably factual. We add to that his 1) parenthetical about Offline having promised to have a project manager check orders, 2) insinuations that none of the orders were checked, and 3) the accusation that Offline personnel "hadn't followed the spreadsheet directions." In so coupling the evidence, we see how Castleman wanted his

11

readers to conclude that his comment about "no one from" Offline "review[ing] any of the orders to ensure they were being done correctly" was more than mere opinion.

In effect, Castleman's words acted as a syllogism. Its premise was that there would be no errors if Offline both 1) followed its instructions and 2) provided the requisite personnel to assure compliance with them, as agreed. Its conclusion was that because an investigation proved that 85% of the orders were erroneous then Offline failed to provide the requisite personnel to assure compliance with the instructions, as agreed. So cast, one can view Castleman's words as voicing more than a mere opinion about no one at Offline reviewing the orders and complying with the spreadsheet directions.

In short, at least two falsehoods by Castleman were posed as verifiable fact and intended by him to be so viewed. At least two were not masquerading as mere opinion.

While Castleman said little if anything about the remaining elements of defamation, we nonetheless address them. Statements that injure one's office, profession, or occupation are normally defamatory per se. *Dallas Morning News, Inc.*, 2018 Tex. LEXIS 404, at *9. The defamatory statements discussed above were aimed at Offline's profession and hit their mark, or so at least some evidence would allow a reasonable person to infer. Given that the remarks disparaged the ability of Offline and O'Connor to properly conduct their business, they were defamatory per se. *See In re Lipsky*, 460 S.W.3d at 596 (stating that to qualify as damages per se, the disparaging words must affect the plaintiff in some manner that is peculiarly harmful to his trade, business, or profession and not merely his general character). The statements being defamatory per se, Offline and O'Connor need not prove damages, *id.* at 593, even though some

12

evidence appears of record from which it can be reasonably inferred that they actually suffered them.

As for the requisite degree of fault, Offline was a private entity while O'Connor was a private individual when the statements were uttered. No one suggested otherwise. Thus, the two plaintiffs need only present evidence sufficient to illustrate that Castleman acted negligently in publishing his remarks. *Id.* at 593. Negligence, in the context of defamation, denotes a failure to investigate the truth or falsity of a statement before its publication and the failure to act as a reasonably prudent person. *Harwood v. Gilroy*, No. 04-16-00652, 2017 Tex. App. LEXIS 5931, at *17-18 (Tex. App.—San Antonio June 28, 2017, no pet.) (mem. op.). That is, the plaintiff need only show that the defendant knew or should have known the defamatory statement was false. *Id.* There is evidence of record illustrating that Castleman investigated what he deemed to be an error, discussed the matter several times with O'Connor via email or other electronic means, and was referred to the instructions given O'Connor on how to place orders on his behalf. Those instructions were part of an electronic file (i.e. "Google Drive") made available to Offline's personnel, and they contained directions informing the reader to double the order actually placed by a customer. After O'Connor and Castleman engaged in these electronic communications, someone accessed the Google Drive containing the internet instructions and removed the directive about doubling a customer's order. Castleman then began posting on his internet "warning" about and diatribe against Offline and O'Connor.

The foregoing reveals an investigation into the accuracy of O'Connor's explanation and justification for placing the orders that were placed. The initial instructions provided

the measuring stick against which O'Connor's conduct was to be gauged as proper or improper. If he was told to double the orders, then there was no "85% error rate," and Castleman's statement about that rate would be quite false. Yet, someone changed the measuring stick, and the defamatory comments began. At the very least, one can reasonably infer that Castleman knew or should have known of the measuring stick legitimizing O'Connor's conduct and rendering inaccurate his comments about an "85% error rate. Nevertheless, he made his comments disparaging the manner in which Offline performed. Thus, prima facie evidence of negligence, if not a higher *mens rea*, appears of record.

Finally, the very evidence that illustrates Castleman's words to be false negate his defense of truthfulness. Again, Castleman's statements arose from Offline's doubling of orders. If Offline was told to double the orders and it did so, then the allegation about an "85% error rate" is false. X cannot legitimately claim that Y provided defective service when Y did the very thing told him by X. Similarly, if Offline personnel actually called a Castleman employee to inquire about the accuracy of an order (as indicated by the evidence of record), then uttering that no one from Offline reviewed any of the orders is a falsehood.

We caution that our review of the record was undertaken per the standard of review. Again, it obligated us to view the evidence in a light most favorable to Offline. That does not mean the ultimate fact-finder must construe it similarly. Whether it be the trial court or jury, it has the authority to interpret the evidence as it chooses. Nevertheless, in undertaking our review of the record, we encountered sufficient clear and specific evidence to support a rational inference that the allegations of fact, that is the elements

14

of defamation, are true. Thus, the trial court did not err in denying Castleman's motion to dismiss.

*Who Were the Movants*

Next, we address whether both Castleman and Castleman Consulting, LLC moved to dismiss the cause per the TCPA. One may question whether this topic has little consequence given our conclusion that the trial court did not err in denying the motion. Nevertheless, we were directed to "consider Castleman's remaining issues" by the Supreme Court. This is one of the "remaining issues."

The trial court found that only Castleman, individually, moved to dismiss the action. In assessing the finding's accuracy, we are mindful of our obligation to construe pleadings to do substantial justice. *Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 717 (Tex. App.—Fort Worth 2017, no pet.). Though some may debate about whether a motion is a pleading, we see little reason to forgo application of the same rule to it. This seems especially appropriate given that substance must control over form. *See Sedano v. Mijares*, 333 S.W.3d 815, 819 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

Here, Castleman alluded to himself and the "right to speak his mind" in the opening paragraph of the motion. Nothing was said of Castleman Consulting. Yet, he later explains that "[t]his motion refers to Castleman and his company, on the one hand, and O'Connor and his company, on the other collectively." We also note the prayer wherein the trial court was told that "Castleman prays that the Court dismiss O'Connor's suit." This prayer tends to comport with the explanation that the two litigants on both sides of the dispute were being alluded to "collectively." If this were not so, then we would have to read the prayer as a request for the dismissal of only O'Connor's portion of the suit.

That seems nonsensical if not absurd since both O'Connor and Offline sued. Why a defendant would want to dismiss the claims of only one plaintiff when the grounds for dismissal apply to both would leave us shaking our heads in wonderment. So, in doing substantial justice here we construe the use of the name "Castleman" in the prayer as a request by the collective of defendants aimed at the opposing collective of plaintiffs. In other words, both Castleman, individually, and Castleman Consulting moved to dismiss the claims of both O'Connor, individually, and Offline.

*Attorney's Fees*

The final issue before us concerns Castleman's request for attorney's fees under § 27.009 of the Civil Practice and Remedies Code. Had the collective of Castleman and Castleman Consulting succeeded in establishing that their motion to dismiss should have been granted, an award of fees would have been appropriate. TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a) (stating that "[i]f the court orders dismissal of a legal action under this chapter, the court shall award to the moving party . . . court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require"). But, they did not succeed. So, neither are entitled to attorney's fees under § 27.009(a).

We overrule all "the remaining issues" and affirm the order of the trial court denying the motion to dismiss.

Brian Quinn
Chief Justice

16